R. T. JONES LUMBER COMPANY, Inc.,
Libelant-Appellee,

v.

ROEN STEAMSHIP COMPANY,
Respondent-Appellant.

No. 307, Docket 25498.

United States Court of Appeals
Second Circuit.

Argued May 12, 1959.

Decided Sept. 22, 1959.

Sparkman Foster, Detroit, Mich. (Foster, Meadows & Ballard, Detroit, Mich., and Arthur E. Otten, Buffalo, N. Y., on the brief), for appellant.

Fenton F. Harrison, Buffalo, N. Y. (Bigham, Englar, Jones & Houston, New York City, Coffey, Heffernan & Harrison, and Laurence E. Coffey, Buffalo, N. Y., on the brief), for appellee.

Before SWAN, HINCKS and MOORE, Circuit Judges.

HINCKS, Circuit Judge.

The appellee, R. T. Jones Lumber Company, brought a libel to recover damages occasioned by the failure of the appellant, Roen Steamship Company, to deliver part of a lumber cargo shipped on its barge Hilda. Judge Burke found the appellant liable on the ground that the unseaworthiness of the Hilda, rather than a "peril of the sea," directly caused the cargo to fall and be lost into the seas during a severe storm. His final decree of December 2, 1958, awarding appellee the damages reported by a Commissioner, is here challenged because of alleged errors in the Commissioner's basis of computing damages as well as in the basic finding of liability.

Since the facts are amply set forth at D.C., 158 F.Supp. 304, 306, they need be only briefly stated here. For clarity, the parties will be referred to by their relationship to the litigation below.

The Hilda, owned and operated by the respondent, was a converted car ferry with facilities for only on-deck cargo. In November, 1955 she took aboard 1,944,531 feet of lumber at Blind River, Ontario, and on November 18, 1955 proceeded down Lake Erie on her usual course for Tonawanda, New York, as her destination. Suddenly and without the benefit of prior weather reports she met shifting and increasing winds at 7:30 p. m. on November 20, but although the seas were 12 to 15 feet high and the winds reached gale velocities of 50 miles an hour, she continued her journey without mishap for three hours. It was only after she had turned 30 degrees to port in order to negotiate Buffalo Harbor that the wind caught her port side causing her to roll so hard that part of her cargo was lost.

The trial court concluded that the loss was not due to a "peril of the sea" on the basis of findings that the storm was not an unusual event for Lake Erie in November but one which could reasonably be anticipated and provided against. Instead, the Court attributed the loss to the fact that the respondent, who controlled the quantity and height of the load, had loaded the barge to such a height that she was top-heavy, unstable and unseaworthy for the cargo she carried at the beginning of her voyage. This, it was held, rendered the respondent liable under its original contract of affreightment and bill of lading.[1]

---

1. Clause 6 of the original contract of affreightment provided—
"6. Cargoes shall be carried during the navigating season of 1955 at times which are mutually agreeable subject to intervention of government agencies, acts of God, accidents, or other causes beyond control of the Carrier or Buyer."
And the bill of lading provided that the shipment was subject to the exemptions

■■ We accept the Court's findings as to the weather conditions encountered and the fact that such conditions were not unusual and beyond reasonable expectation. Such findings could be reversed only if clearly erroneous, McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20. Here even the respondent's evidence sufficiently supported these findings. The real thrust of respondent's argument is that less vicious storms in numerous cases have been held to be "perils of the sea" and that the trial court thus erred as a matter of law in concluding that no "peril of the sea" was involved. Although courts have occasionally said that the question whether any given conditions constitute "perils of the sea" is purely one of fact, The Frey, 2 Cir., 106 F. 319; The Governor Powers, D.C.D.Mass., 243 F. 961, it is clearly our province to determine whether such conditions meet the requirements of a legally sound definition. As we said in Duche v. Thomas & John Brocklebank, 2 Cir., 40 F.2d 418, 420:

> "The difficult task is not to define in general terms a peril of the sea, but to determine whether some established facts and circumstances, like those proved in this case, fall within a sound definition."

■ Notwithstanding the respondent's contrary contentions, the numerous definitions of "peril of the sea" place its meaning beyond dispute. We noted in the Duche case that a multiplication of definitions serves no useful purpose, and we accept now as we did then the following definition as accurately stating the legal meaning of "perils of the sea."

> "Perils of the seas are understood to mean those perils which are peculiar to the sea, and which are of an extraordinary nature or arise from irresistible force or overwhelming power, and which cannot be guarded against by the ordinary exertions of human skill and prudence." The Giulia, 2 Cir., 218 F. 744, 746.

■ The proved facts in this case do not amount to a "peril of the sea" as thus defined. In The Rappahannoch, 2 Cir., 184 F. 291, in which we considered admitted weather conditions on these same Great Lakes which were more severe than in the present litigation, we reversed a decree for the carrier because it failed to sustain its burden of proving a "peril of the sea" exception.

■■ Turning next to the question of seaworthiness, it is clear that that term means not only the reasonable ability of a ship to meet the anticipated conditions of the sea but its ability to carry safely the cargo which it has accepted for shipment. The Silvia, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241; The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65. The respondent, however, challenges the Court's conclusion that the loss was caused by the unseaworthiness of the Hilda at the commencement of her voyage rather than by an accident beyond the control of the respondent. The trial court based this conclusion on direct expert testimony and reasonable inferences from other evidence presented, which led it to find that the Hilda, which had never undergone stability tests since her conversion from a car ferry, was unstable and topheavy at least when laden as she was for this voyage. We think that the preponderance of the evidence demonstrates the correctness of this finding: certainly it was not clearly erroneous. The conclusion is supported by the fact that the Hilda pro-

from liability contained in the "Carriage of Goods by Sea Act," 46 U.S.C.A. § 1304, which in turn provides—
"(1) Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, * * *

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising * * * from—
* * * * *
"(c) Perils, dangers, and accidents of the sea or other navigable waters; * * *".

ceeded for three hours without mishap under the same weather conditions and lost her cargo only when she turned to port and exposed the vessel with its high-piled cargo broadside to the wind. The conclusion is no less sound because of the fact that the Hilda was not loaded below her Plimsoll marks, which would only indicate she was not overloaded weight-wise, not that as loaded she was free from dangerous vulnerability to wind. Moreover, the respondent's argument that the finding must fall because the Hilda had often carried like loads without mishap cuts equally hard the other way: given the additional fact that such storms were not unusual it is reasonable to infer that on this particular trip she was unseaworthy with respect to her cargo. The Colima, D.C.S.D.N.Y., 82 F. 665.

■ The respondent contends that the libelant's consent to stowage on deck precludes recovery, relying for this proposition on the case of Lawrence v. Minturn, 17 How. 100, at pages 114–115, 15 L.Ed. 58. That was a case in which the Court meticulously restricted its holding to a situation in which "the vessel was seaworthy to carry a cargo under deck, and there was no general custom to carry such goods on deck in such a voyage." But that is not the situation here. The Hilda was not equipped to carry the cargo below deck and these very parties had long participated in a custom to carry the cargo on deck. In Olsen v. United States Shipping Co., 2 Cir., 213 F. 18, 21, we refused to extend the Lawrence v. Minturn holding "to such a loading as makes the ship herself unseaworthy when no sea peril is encountered." We still adhere to the view expressed in that opinion that it would "be unwise and dangerous to impair the implied warranty of seaworthiness of the ship herself." See also Pioneer Import Corporation v. The Lafcomo, 2 Cir., 138 F.2d 907; The Royal Sceptre, D.C.S.D.N.Y., 187 F. 224.

Finally, we find no basis in fact for the respondent's argument that the libelant controlled the amount of lumber loaded and therefore must suffer the loss. The record, including the direct testimony of the respondent's barge master, abundantly demonstrates that absolute control over the amount as well as the manner of loading was in the respondent. The Court properly refused the respondent's motion to reconsider the case on the basis of certain evidence which had been presented at the hearing on damages. In its most favorable light to the respondent, this evidence showed that the libelant may have had an agent at Blind River who may have known the amount of cargo put aboard. Other evidence received at these hearings could also support an inference that the libelant knew the total quantity of lumber actually shipped upon the Hilda and in fact requested its shipment. There was no evidence, however, either at these hearings or on the trial itself, that the libelant controlled the loading of the barge. As we said in Olsen v. United States Shipping Co., supra, with respect to a ship's unseaworthiness as to on-deck cargo (213 F. at page 21):

" * * * It makes no difference whether this was due to the amount or the stowage of the deckload alone or also to the fact that the largest ballast tank could not be filled. All these matters were under the absolute control of the master and it was his duty to see that they were right. It was no excuse to him that the charterers did the loading; insisted upon his taking the deckload or that surveyors certified that the ship could do so safely. No doubt both thought so. That, however, did not lessen his duty, especially in view of the fact that he did not think so himself."

■ Lastly, we come to the respondent's objections to the amount of damages awarded. The proper measure is the fair market value of the lumber lost at the point of destination which was Tonawanda. The Ansaldo San Giorgio I, 2 Cir., 73 F.2d 40, affirmed 294 U.S. 494, 55 S.Ct. 483, 79 L.Ed. 1016.

We think that the libelant adequately met its burden in proving such damages and that the award is in accord with the proofs.

The only testimony given at the hearings to ascertain damages was that of libelant's president and William Gillespie, the sales manager of libelant's largest lumber supplier in Blind River from whom most of the lost cargo was purchased. They testified that they were familiar with the market for lumber in Canada and eastern United States; that the lost lumber, subsequent to its purchase, had been seasoning for several months prior to its shipment at Blind River; and that the supply was limited and the demand active. They gave it as their opinion that at the time of shipment at Blind River the lumber had a fair market value of 15% above the price which the libelant had paid in Ontario on its purchase of almost two million feet; that it carried a higher price in Canada and the United States when sold in smaller lots; and that it couldn't be bought at Tonawanda or Buffalo at prices less than its estimated value at Blind River (15% above purchase price).

The respondent argues that on the record as made there was no basis for finding that the applicable market value exceeded the cost of the lumber to the libelant. But original cost may be taken as the measure of damages only when market value, because of the special purpose or peculiarity of the subject-matter of valuation, would not fairly represent true worth. Normally, comparable sales are best evidence of market value. Texas Co. v. R. O'Brien & Co., 1 Cir., 242 F.2d 526, Baetjer v. United States, 1 Cir., 143 F.2d 391, certiorari denied 323 U.S. 772, 65 S.Ct. 131, 89 L.Ed. 618. See also Goldenberg v. World Wide Shippers & Movers of Chicago, Inc., 7 Cir., 236 F.2d 198. But, as was noted in Texas Co. v. R. O'Brien & Co., supra [242 F.2d 527], "other factors besides sales * * * should have been considered" in so far as they shed light on market value. And where there was a market value "the sole endeavor should have been to determine what it was, not to have sought something else." The Court observed that if comparable sales were absent or inconclusive, "while the testimony of an expert does not have to be accepted, if the assessor could not reach a conclusion from the sales he should not have rejected it without some reasons." We see no good reason why in the circumstances of this case the uncontroverted expert testimony here should have been rejected. We find no error in the award.

Affirmed.