**FREEDMAN & SLATER, INC., and Continental Car Combine, Libelants,**

**v.**

**M. V. TOFEVO, her engines, etc., and Cie De Transports Oceaniques, Respondent.**

United States District Court
S. D. New York.
April 10, 1963.

Kelly, Donovan, Robinson & Maloof, New York City for libelants. (David L. Maloof, New York City, of counsel).

Dougherty, Ryan, Mahoney & Pellegrino, New York City, for respondent. (Lawrence J. Mahoney, New York City, of counsel).

CROAKE, District Judge.

This is an action in admiralty for damage to a shipment of one hundred and seven Goggomobile automobiles transported from Hamburg, Germany, to New York, aboard the vessel M. V. TOFEVO, during December 1958 and January 1959. Libelants bring this action as owners of the cars involved. It is undisputed that the Goggomobiles were damaged during the voyage while in the possession, custody and control of the respondent shipowners.

The rights and duties of the parties herein are governed by the United States Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq.

Libelants allege that any damage to the automobiles was the result of negligent and improper stowage of this cargo by the respondent.

The respondent takes the position that any damage sustained by the cargo was caused by severe weather encountered by the vessel which constituted a peril of the sea within the meaning of the Carriage of Goods by Sea Act, 46 U.S.C. § 1304(2), which provides:

"(2) Neither the carrier nor the ship shall be responsible for loss

or damage arising or resulting from—

    \*    \*    \*    \*    \*    \*

"(c) Perils, dangers, and accidents of the sea or other navigable waters;

"(d) Act of God. \* \* \*"

Respondent further asserts that the cargo of Goggomobiles was properly stowed aboard the vessel and that due diligence was exercised to make the vessel seaworthy before the voyage.

In the event it is determined by the court that respondent is liable for damages, a second issue raised is whether the customary freight unit was the cubic meter or the vehicle itself for purposes of determining respondent's limitation of liability pursuant to 46 U.S.C. § 1304(5). This section provides that a carrier shall not be liable for any loss "in an amount exceeding $500 per package \* \* \* or in case of goods not shipped in packages, [$500] per customary freight unit, \* \* unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. \* \* \*"

On December 15, 1958 the shipment of Goggomobiles was delivered to respondent at Hamburg, Germany, for carriage to New York, for which a bill of lading was issued. All of the vehicles were then in apparent good order and condition. The cars were unpacked and without covering of any kind. On December 16, 1958 they were loaded aboard the vessel M. V. TOFEVO and stowed in various cargo compartments.

The M. V. TOFEVO is what is known as a single 'tween deck ship, meaning that there is only one internal cargo deck in addition to the lower hold. Forty-five Goggomobiles were stowed in No. 2 'tween deck, over a cargo of teakwood planks of varying sizes, which made an uneven floor. Other cars were stowed in the lower holds over other cargo consisting of bales of rubber, bags of tapioca flour, and general cargo. In the latter instance, the cars were stowed on a dunnage flooring placed over general cargo.

The cars were stowed fore and aft, in some instances twelve abreast, and all of them over other cargo. They were secured by rope lashings which, in almost all cases, were affixed to the bumpers and bumper bar extensions. The latter consisted of a hollow metal tube, less than an inch in diameter, running from the bumper to the fender at each corner of the vehicle.

The cars were lashed to each other, in a chain-like effect, except for the end cars which, in addition to being lashed to the adjacent vehicle, were secured to a part of the vessel.

The parties are in dispute as to the type of lashing used. The captain of the vessel testified that Hercules rope, which is a rope with a wire core, was used. Witnesses for both sides testified that they found pieces of ordinary hemp rope tied to the Goggomobiles, when they observed them on the deck after discharge.

Rectangular wooden frames consisting of timbers 2¼ inch thick were also used to secure at least some of the vehicles. These were situated in front of the front wheels, along the sides of the wheels, and behind the rear wheels. There were no wooden chocks placed either behind the front wheels or in front of the rear wheels of the vehicles.

The M. V. TOFEVO embarked from Hamburg, Germany, on December 20, 1958 on its voyage to New York. The vessel followed a course known as the middle course in the North Atlantic.

While the vessel was following a course almost due west and at a position south of Newfoundland, it encountered a heavy storm on December 31, 1958 and January 1, 1959. It was during this storm that respondents allege that the cargo of Goggomobiles sustained the damages for which libelants seek to recover in this action.

For part of the period of the storm, the log books of the vessel record wind velocity of force 12 to 13 on the Beaufort scale in two separate log entries: (1) during the afternoon of December

21, and (2) during the morning of January 1. However, in the instance of the latter entry the original figures entered in the smooth log book appear to have been force "8 to 9." This was changed to force 12 to 13 by the first mate, with the knowledge and approval of the captain. The alteration was not made in the customary manner, that is, by drawing a line through the matter to be changed and then writing the new matter next to the crossed-out entry. In this case, the original entry was simply written over with the figures "12" and "13."

Other wind force reports which appear in the ship's log during the storm are: forces "9/8," "9/10," "10/11" and "12."

Libelant offered testimony of a well-qualified oceanographic and meteorological expert, Professor William Donn, whose testimony showed that observation reports of wind force made by other vessels in the same area during the period of the storm were distinctly below the maximum winds reported by the vessel TOFEVO.

The highest wind force reported by other ships in the area during the same period was force 11.

At the same time the TOFEVO reported force 12 to 13 winds in the afternoon of December 31, other vessels near the TOFEVO reported wind force of 7. In the morning of January 1, when the ship's log reported winds of force 12 to 13, other vessels in the general area of the ship reported winds of force 9 to 11.

It was further established by this witness that estimations by mariners of wind speed at the higher ranges of the Beaufort scale are difficult because as the wind speeds become higher the Beaufort number encompasses a larger range of wind speeds.

Based upon an analysis of storms occurring from mid-December to mid-January during the twelve years preceding this storm, Professor Donn testified that storms of the same type encountered by this vessel had winds of at least force 10, and in four of these years the force reached force 11.

Professor Donn further testified that the United States Pilot Charts show that storms with gale winds (at least force 8 or higher) occur 16 percent of the time in the area involved, or approximately one out of every six days, during this time of year.

Of particular interest was the following testimony of this expert at page 263 of the trial transcript:

"Q  Would you conclude, then, that the weather which was met by the S/S Tofevo was rare weather for the time and place?"

"A  No.  I would conclude that, without any question, both upon my examination of this particular storm and my experience in looking at marine weather conditions, that the storm encountered by the Tofevo was a normally severe storm which is expectable in the North Atlantic Ocean at the time of the year and in the place in question."

In R. T. Jones Lumber Co. v. Roen Steamship Co., 270 F.2d 456 (2d Cir. 1959), the Court of Appeals stated, at page 458, the test to be applied in determining what constitutes a "peril of the sea" under the statute, as follows:

" 'Perils of the seas are understood to mean those perils which are peculiar to the sea, and which are of an extraordinary nature or arise from irresistible force or overwhelming power, and which cannot be guarded against by the ordinary exertions of human skill and prudence.'  The Giulia, 2 Cir., 218 F. 744, 746."

An important factor in determining whether the weather was a sea peril is the extent of damage sustained by the vessel itself.

In the instant case there is a paucity of proof that the vessel sustained any damage at all, structural or otherwise, during this storm.

When the captain was questioned concerning damage to the ship which occurred during the storm his testimony

was equivocal, vacillating and contradictory. A reading of selected portions of his testimony below will make this readily apparent:

"Q Now, did you testify on direct examination that the storm caused leaks and leaky rivets in the ship?

"A I didn't say that that was the only possible cause, or that the only possible cause was the bad weather. I merely stated that we observed that this was the case after the storm.

"Q Captain, when did you first notice that this ship was leaking?

"A It was at the beginning of the crossing.

"Q You noticed that your ship was leaking at the beginning of the crossing?

"A Yes, we had pumps." (Page 73, trial transcript.)

\* \* \*

"Q So that we can't say, can we, that the storm caused the rivets to leak, can we?

"A Yes, but I have stated that there was at the beginning when we started that crossing, before we started that crossing, and that was before the heavy rolling of the vessel.

"Q Now, besides the rivets that were leaking, what other damage did you say occurred to the ship as a result of this storm, structural damage?

"A There has been cracks and breaks in the metal sheathing, and there were—the ribs were twisted and they were deformed."

\* \* \*

"Q And when was this first noticed?

"A Well, we repaired that in drydock in New York.

"Q Do you say that they became deformed during the storm?

"A No, because it was impossible."

\* \* \*

"Q All right, let us continue then. You don't know when they became deformed, do you?

"A I don't know. It was observed after the crossing. I cannot know.

"So that I observed that it was done during the storm, but I would assume that it was during the preceding days." (P. 74, 75, trial transcript.)

\* \* \*

"Q Do you know what repairs were made at New York?

"A I don't remember precisely.

"Q Weren't the only repairs made those repairs revolving around the rivets and the leaks to the ship?

"A This it seems to me yes, but I don't recall." (P. 77, trial transcript.)

\* \* \*

The only damage of which any mention is made in the Voyage Report by the Captain (Respondent's Exhibit L, page 2) regarding the crossing to New York is leaking rivets, a condition which, by the Captain's own admission, pre-existed the storm. This is buttressed by the Voyage Report of the Captain, which states at page 2, under "III—INCIDENTS DURING THE CROSSING—DAMAGES," the following:

"\* \* \* The leaks of the rivets in the double bottom of Hold I were repaired provisionally \* \* \*. It seems that the rivets were not replaced during the drydocking in Hamburg on *March 25, 1958*. The leaks worsened on our arrival in New York to such a poitn (sic) that they were irreparable while the vessel was afloat. \* \* \*" (Italics added.)

The failure of proof of structural or other damage to the vessel itself as a direct result of the storm, when coupled with wind speed reported distinctly in ex-

cess of that reported by other ships in the vicinity, seriously weakens respondent's contention that the storm constituted a "peril of the sea."

Another important consideration on the question of sea peril is the distance traveled by the ship and the rate of speed it maintained during the storm. The Captain testified that the average distance the TOFEVO traveled during a 24-hour period in fair weather was "about 336" miles and that its average speed was 14 knots.

The log book shows that during the worst period of the storm, from noon of December 31, 1958 to noon of January 1, 1959, when wind force of 12/13 is reported twice, the vessel traveled a distance of 290 miles, making an average speed of 11.6 knots. The difference between this speed and distance traveled and the average speed and distance traveled in fair weather is not great enough to lead to the conclusion that the storm was catastrophic in nature.

Even if these factors were not decisive, there is still another powerful circumstance which militates against the peril of the sea contention, namely, the alteration made in the official log book of the vessel. The fact that the alteration made in the log book was not in the usual manner raises serious doubt as to the complete reliability of the wind entries made therein. No satisfactory explanation of the making of the alteration in the manner in which it was made was given during the trial.[1]

As stated by Judge Dawson in New Rotterdam Insurance Co. v. SS. Loppersum (S.D.N.Y., 215 F.Supp. 563, 1963),

at page 567, a case impressively similar to the instant case:

"Courts have universally condemned the practice of altering any of the entries in the ship's log. Judge Learned Hand in Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha, 102 F.2d 450, 453 (2d Cir., 1939), said: ' * * * [W]e cannot avoid the conclusion that it [the log book] had been dressed up to excuse the ship's faults. That goes much further than merely to discredit "the document itself; it is positive evidence upon the very issue, and weighty evidence as well. Wigmore § 278. When a party is once found to be fabricating, or suppressing, documents, the natural, indeed the inevitable, conclusion is that he has something to conceal, and is conscious of guilt. * * *' Skibs Aktieselskapet Orenor v. SS. Audrey, D.C., 181 F.Supp. 697, 1960 A.M.C. 723."

■■ Respondent had the burden of establishing that the weather encountered constituted a peril, danger or accident of the sea, or an act of God, within the meaning of 46 U.S.C. 1304(2) (c) and (d). General Foods Corp. v. The Troubador, 98 F.Supp. 207, 209; 18 F.Supp. 207, 1951 A.M.C. 662, 664 (S.D.N.Y. 1951); J. C. Penny Co., Inc. v. The American Exp. Co., Inc., D.C., 102 F.Supp. 742, aff'd 201 F.2d 846 (2d Cir. 1953); Edmond Weil, Inc. v. American West African Line, Inc., 147 F.2d 363, 366 (2d Cir. 1945). The above considerations lead the court to the conclusion that respondent has failed to sustain that burden.

---

1. The court concedes the possibility that an innocent error might have been made by the first mate in copying the entry from the rough log to the smooth log and that the alteration of the smooth log might have been an honest correction. Some evidence in support of this inference is that the entry in the rough log (respondent's Exhibit "B") for January 1 (4–8 A.M.) for wind force is "12/13."

The court has considered this fact but finds that the respondent, who has the burden of explaining the altered log book, has failed satisfactorily to explain the alteration. There is no evidence in the record as to which entry, rough or smooth, was made first in this instance, nor any testimony to the effect that the previous entry in the smooth log was an error in transcription and that the reason the change was made was solely to correct such error. Absent such unequivocal evidence, the court must question the value of this log entry.

■ The court also concludes that the weather was not so catastrophic nor so overwhelming that the effects thereof could not be guarded against "by the ordinary exertions of human skill and prudence," as that phrase is used in The Giulia, 218 F. 744, 746 (2d Cir. 1914). The evidence shows that the storm encountered by the TOFEVO was foreseeable, expectable weather which might have been reasonably anticipated in the North Atlantic during the winter months.

■ The court further concludes that respondent has failed to sustain its burden of showing that its stowage of the cargo was proper. This conclusion is reached after review of an impressive array of facts evidencing poor stowage in this case.

All vehicles were stowed over other cargo, a fact which itself may be considered poor stowage according to some of the expert testimony. There is conflicting expert testimony on this point. Forty-five of the cars were stowed on top of teakwood planks, which presented an uneven, lopsided floor, providing a poor foundation.

Other vehicles were stowed over bales of rubber and bags of tapioca flour with only tarpaulin between. There was expert testimony that such cargo has a tendency to settle during a voyage.

Captain Twemlow, an expert witness called by respondent, testified that stowage of automobiles over any cargo which would not give a level floor would possibly cause the lashings to slacken and stretch when the cars which were not entirely upright rolled in different directions. He admitted that stowage that did not provide a substantial and level flooring was undesirable and improper. In No. 2 'tween deck ten of the cars stowed over teakwood planks were completely adrift when the vessel arrived in New York.

Placing this shipment of compact cars over the cargo enumerated above, in the manner stated, for a voyage during the winter months in the North Atlantic when heavy weather and violent rolling and pitching seas are to be expected is an open invitation to trouble, and the court finds that it constituted improper stowage.

The court further finds respondent was negligent in securing the cars by the bumpers and obviously weak bumper bar extensions instead of by the axles. The evidence showed that most of the bumpers and extensions were torn off, indicating that these parts were not, in fact, strong enough to withstand the strain of the lashings, compounded by the weight of the other cars in the chain.

The testimony, including that of experts called by respondent, supports the finding that the stronger and better point at which to secure the lashings was the axle of each vehicle. Also by lashing to the smooth parts of the axles, instead of the sharper edges of the bumpers, respondent would have eliminated the danger of lashings being cut.

It was also poor stowage for respondent to lash the vehicles to each other in a chain-like effect with only the end cars lashed to the vessel itself. The testimony shows that a break in one of the lashings could free an entire string of cars and cause damage to other cars many feet away. For proper stowage each vehicle might have been lashed separately to a part of the vessel itself, or a false deck might have been employed to provide the vehicles with their own flooring with individual pad-eyes. The fact that none of these cars were individually secured was instrumental in causing a chain reaction effect.

Another defect in stowage, in the opinion of the court, was the absence of wooden chocking behind the forward wheels and in front of the rear wheels of the cars. Furthermore, the Captain testified that there were some cars that "may not" have had frames or chocking around them at all.

With regard to the type of line used for lashing the cars, Captain Twemlow testified that he did observe some Hercules line in use when he surveyed the cargo of Goggomobiles in New York;

however, he also stated that there were other lashings he observed on the Goggomobiles which were not Hercules line (trial transcript, p. 355).

He further testified that the line he observed on cars after they had been discharged from the vessel was mostly "just line not reinforced with wire." (Trial transcript, p. 356.) The court finds this testimony damaging to the contention of the respondent that the vehicles were uniformly secured with Hercules line.

The court also finds that it was improper to stow a number of cars in places that were inaccessible during the voyage. As a result, the crew was thwarted from tightening or re-securing lashings of such vehicles which loosened or broke. The effect a loose Goggomobile would have on neighboring vehicles during rolling seas and heavy weather was doubtlessly devastating.

■ All of the foregoing factors convince the court beyond a peradventure that the damage in this case could have been avoided if the respondent had exercised more prudence, care and foresight in stowing these vehicles. The court is cognizant of the fact that the shipowner is not an insurer of the cargo and that the shipowner is not required to furnish the best possible stowage that could be achieved under the circumstances. However, the respondent had a duty to provide reasonably safe and secure stowage commensurate with the nature of the cargo involved, the vessel, the time of year, the route of the voyage, and the weather to be reasonably expected. Middle East Agency v. The John B. Waterman, 86 F.Supp. 487, 489 (S.D.N.Y.1949), 46 U.S.C. § 1303(2).

It was the burden of respondent to establish proper stowage, which it has failed to do. In securing the cargo as it did, respondent took a risk and is responsible for the damage that libelants sustained. See Beck & Co. v. SS. Steel Voyager, 1957 A.M.C. 1515, 1519 (S.D. N.Y.1957).

■ The remaining question in this case relates to the carrier's limitation of liability under the Carriage of Goods by Sea Act.

Title 46 U.S.C. § 1304(5) limits the liability of the carrier to $500 "per package," or, in the case of goods that are not shipped in packages, $500 "per customary freight unit."

It is undisputed that the Goggomobiles in the instant case were not "packages" within the meaning of the Act. The parties are in agreement that the phrase "per customary freight unit" is applicable; however, they differ as to the definition of "customary freight unit."

Respondent contends that each vehicle constituted the freight unit since the freight was assertedly charged at a specific cost for each vehicle. In support of its position, respondent relies upon the bill of lading which shows that the freight charge was computed by multiplying the number of cars of each model by the rate per vehicle for that particular model.

Libelants, on the other hand, urge that although the charges for freight may have been made in this manner, the controlling factor in this case should be the measurement unit used in arriving at the rate per automobile shown on the freight tariff of the carrier.

William J. Altreuter, a witness called by respondent and freight manager for its general agent, testified that the charge for transporting the vehicles was arrived at by multiplying the rate per vehicle set for each class of vehicles by the number of vehicles in that class. He further testified that the rates per vehicle were taken from a freight tariff, copy of which was introduced into evidence as libelant's Exhibit 18. On cross-examination, Altreuter stated that the freight rate per vehicle quoted on the tariff for each type of Goggomobile was calculated by multiplying the number of cubic meters shown for each model of Goggomobile by a certain rate per cubic meter. In this case, he believed that the rate was $15.75 per cubic meter, but was not sure.

Libelants argue that since the cubic meter is employed as the basic unit of measurement for the calculation of a freight rate per car, one cubic meter should be regarded as the customary freight unit in this case.

The freight tariff used by respondent in the instant case was prepared by the Continental North Atlantic Westbound Freight Conference, an association of carriers to which it belonged. It reads, to the extent pertinent, as follows:

*"RE: LIST OF SPECIAL RATES COVERING THE QUOTATION PERIOD.*

| "Commodities | Reduced Rates (Temporary) Nov., Dec., 1958 and January 1959 | |
|---|---|---|
| | | $ |
| * * * * * * * * * * * | | |
| "— Goggomobile Std. 57: | 4.826 cbm | 72.00 ea.) |
| — Goggomobile Coupe: | 5.140 cbm | 77.00 ea.) |
| — Goggomobile Transporter: | 6.393 cbm | 83.00 ea.)" |

———◆———

It should be noted that the freight rate per cubic meter assertedly used in computing the freight charge for each model of Goggomobile shown on the tariff does not appear anywhere on the tariff. Moreover, the three listed rates for Goggomobiles, when divided by the number of cubic meters listed opposite each, produces three different rates per cubic meter, viz., $14.919, $14.980 and $12.982. Thus, contrary to the testimony of Altreuter, the "freight rate" per cubic meter, could not have been $15.75 and would have been different for each of the three models involved. It is also significant that the letters "ea.," an abbreviation for the word "each," appear after each quotation on the tariff, indicating that the quotation of the freight rate is in terms of each vehicle and not in terms of each cubic meter.

The bill of lading (respondent's Exhibit C) also fails to refer to a cubic measurement unit as the basis for computing freight charges.

That portion of the bill of lading which relates to freight charges is as follows:

### FREIGHT TO BE COLLECTED

| "Gross Weight Said to be kilos | Measurement Said To Be CBM | RATE | DOLLARS |
|---|---|---|---|
| 61 Cars [Sedans] | | 72.– | 4,392. |
| 30 Cars [Coupes] | | 77.– | 2,310. |
| 15 Cars [Vans] | | 83.– | 1,245. |
| 1 Car [Sedan T 700] | | 87.– | 87. |

Freight on Value Said to be $_____ at _____ percent
   "      "      "      "      "      "  $_____ at _____ percent
   "      "      "      "      "      "  $_____ at _____ percent

[ADVANCED CHARGES
[COLLECTION FEE

Total $8,034.–"

It is noteworthy that under the printed column entitled "Gross Weight, Said to be Kilos," instead of the weight of the vehicles, the only information given is the number of cars. The next column with the printed "Measurement Said To Be CBM," is left completely blank.

Under the third column, entitled "Rate," the rates applicable to each model of Goggomobile appear. The first three rates coincide with those on the tariff but the fourth relating to "Sedan T 700" does not appear on the tariff.

Thus, both the tariff and bill of lading indicate that a per vehicle rate was used and give no hint that the carrier or the Freight Conference which prepared the tariff used a unit of one cubic meter in arriving at the charges. Even assuming that they did, however, there is no evidence that the industry or the libelant in particular was aware that they did. As noted, all evidence in the bill of lading and the tariff is to the contrary. If the theory urged by the libelant were accepted, shippers would be bound by the internal workings of carriers and their associations. While it is true that acceptance of this theory would be to the advantage of the shipper in this case, the opposite might be true in other cases. In any event, shippers should not have to rely upon or be bound by the testimony of their adversaries in this kind of case, especially where there is a reasonable alternative of looking to the overt dealings between shipper and carrier. Furthermore, shippers should be in a position before the voyage commences of knowing what the possible limitation of liability would be in case of loss so that they may take steps, as they might have taken here, to obtain additional protection if they see fit.

Policy consideration as well as elementary principles of fairness, therefore, indicate adoption of the theory offered by respondent and unless the authorities compel a contrary result the court will adopt that theory.

The use of the word "customary" in the phrase "customary freight unit" which appears in the limitation of liability statute suggests that the freight unit should be one that is well known in the shipping industry or at least one known to the immediate parties. None of the precedents that have been presented to or found by the court has expressly taken this view. Nevertheless, some of the relevant cases, while supplying no definitive formula for deciding the case at bar, do offer support to the theory of the respondent in that they place heavy reliance on the contents of the bill of lading. See, for example, Waterman SS. Corp. v. United States S. R. & M. Co., 155 F.2d 687 (5th Cir. 1946), cert. denied, 329 U.S. 761, 67 S.Ct. 115, 91 L.Ed. 656 (1946), Middle East Company, Inc. v. The John B. Waterman, 86 F.Supp. 487 (S.D.N.Y. 1949), and Gulf Italia Company v. The Exiria, 160 F.Supp. 956 (S.D.N.Y.1958), aff'd 263 F.2d 135 (2d Cir. 1959), cert. denied, 360 U.S. 902, 79 S.Ct. 1285, 3 L. Ed.2d 1254 (1959).

Accordingly, the court holds that libelants are entitled to recover the amount of the damage to each vehicle, but not in excess of $500 per vehicle. The measure of damages shall be based upon the fair market value of the Goggomobiles at their destination, New York, rather than their original cost to the shipper. See St. Johns N. F. Shipping Corp. v. S. A. Companhia Geral, 263 U.S. 119, 125, 44 S.Ct. 30, 68 L.Ed. 201 and authorities cited therein, and R. T. Jones Lumber Co. v. Roen S.S. Co., 270 F.2d 456, 459, 460 (2d Cir. 1959).

Since it is an unliquidated sum, the question of the amount of the damages shall be referred to a commissioner for a determination not inconsistent herewith.

This opinion shall constitute the findings of fact and conclusions of law of the court in accordance with Rule 46½ of the Admiralty Rules.

Settle interlocutory decree on notice.