**ROYAL INSURANCE COMPANY, LTD., Plaintiff,**

v.

**S.S. MARACAIBO, her engines, boilers, etc., Compania Anonima Venezolana De Navegacion, Compania Anonima Venezolana De Navegacion d/b/a Venezuelan Line and Venezuelan Line, Defendants.**

**No. 77 Civ. 4036 (MEL).**

United States District Court, S. D. New York.

April 28, 1980.

---

Donovan, Maloof, Walsh & Kennedy, New York City, for plaintiff; Peter D. Fenzel, Donald M. Kennedy, New York City, of counsel.

Giallorenzi & Campbell, New York City, for defendants; Renato Giallorenzi, Edward A. Keane, New York City, of counsel. ·

LASKER, District Judge.

Royal Insurance Company, Ltd. sues as cargo underwriter to recover for damage to a shipment of one hundred and two jeep pickup trucks transported aboard the S. S. Maracaibo during late September and early October 1975 from Baltimore, Maryland to La Guaira, Venezuela.

At trial, Royal Insurance was held to have proven a prima facie case of liability [1] establishing that the jeeps were received aboard the Maracaibo in good condition and unloaded in damaged condition, and that Royal Insurance's agents had paid the owner of the jeeps for their damage (Tr. 32–33).[2]

Defendants raise the "peril of the sea" defense, Carriage of Goods By Sea Act (COGSA), § 4(2)(c), 46 U.S.C. § 1304(2)(c), contending that the Maracaibo was required to travel through a severe hurricane which caused the damage to the jeeps. Royal Insurance responds first, that, based on the failure to prove structural damage to the Maracaibo, the ship passed through an area of the storm not sufficiently severe to constitute a peril of the sea, and second, that the ship was nevertheless unseaworthy because the jeeps were stowed and secured negligently. Specifically, Royal Insurance argues that some of the jeeps were stowed aburton rather than fore and aft, that some were stowed on top of other cargo separated by unacceptably thin plywood flooring, and that the securing of the jeeps was negligent because of the alleged failure to use drop shoring, appropriate wedges, and lashings.

## I. Peril of the Sea

■ The "peril of the sea" defense is codified at section 4(2)(c) of COGSA, 46 U.S.C. § 1304(2)(c), which provides:

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

.    .    .    .    .

(c) Perils, dangers, and accidents of the sea or other navigable waters;"

This exception to liability has been defined by the Second Circuit as

"those perils which are peculiar to the sea, and which are of an extraordinary nature or arise from irresistable force or overwhelming power, and which cannot be guarded against by the ordinary exertions of human skill and prudence."

*The Giulia*, 218 F. 744, 746 (2d Cir. 1914), *quoted in R. T. Jones Lumber Co. v. Roen Steamship Co.*, 270 F.2d 456, 458 (2d Cir. 1959) (storm found not unusual on Lake Erie in November not a peril of the sea); *see Paul Marsh, Inc. v. S. S. Johann Blumenthal*, 455 F.Supp. 236, 237 (S.D.N.Y. 1978) (one wave ten meters high during storm with winds of 9 to 10 constituted sea peril); *American International Insurance Company v. The Vessel SS Fortaleza*, 446 F.Supp. 221, 225–26 (D.P.R.), *aff'd per curiam*, 585 F.2d 22 (1st Cir. 1978) (wind force

1. The issue of liability was severed from that of damages (Tr. 31).

2. In their post-trial brief (Defendants' Reply Memorandum, pp. 26–28), defendants contend that Royal Insurance has not shown that it paid the owner of the cargo for the damage to the jeeps—and consequently, has not established that it has been subrogated to the rights of the insured and that it is the real party in interest to bring this action—since the subrogation receipts (Plaintiff's Exhibits 16A, 16B) were executed by Aco, S.A. in favor of C.A., DeSeguros Royal Caribe de Venezuela. However, Thomas Mauro, an assistant manager for Royal Insurance, testified that Royal Caribe de Venezuela is Royal Insurance's authorized settling agents in Caracus (Tr. 15–16).

Moreover, defendants have shifted their position since trial, during which they conceded that it was Royal Insurance who paid the insured:

"THE COURT: You are not disputing the fact that there was a subrogation and that

Royal Insurance paid $100,000. to the insured?

MR. GIALLORENZI: They paid at least $100,000. I am disputing whether that was the proper amount."

(Tr. 17–18). Partially on this basis, Royal Insurance was held to have proven its prima facie case of liability (Tr. 32–33).

Even had defendants not conceded that Royal Insurance paid the insured, they have not shown evidence to the contrary, notwithstanding the deposition testimony of Rodolfo G. Remien, a manager of jeep operations for Aco, S.A. in Caracus, that "Royal Globe" was the insurer for the jeeps (Court Exhibit 5, June 27, 1979, p. 31). In light of the representations of Royal Insurance's counsel that Royal Globe was an umbrella company that owned Royal Insurance (Court Exhibit 5, p. 31) the failure of Remien—who was concerned primarily with operations and not with the Financial Department which dealt with the insurance company (p. 33)—to distinguish between Royal Globe and Royal Insurance is inconclusive.

of 10 and waves of 40 feet together with "pounding" constituted sea peril); *Yawata Iron & Steel Co. v. Anthony Shipping Co.*, 396 F.Supp. 619, 623 (S.D.N.Y.1975), aff'd mem., 538 F.2d 317 (2d Cir. 1976) (force 9 winds not a sea peril); *Freedman & Slater, Inc. v. M. V. Tofevo*, 222 F.Supp. 964, 969 (S.D.N.Y.1963) (storm not unusual for area at time not a sea peril when little damage to the ship reported).

The evidence amply supports defendants' contention that the ship encountered a peril of the sea in the form of Hurricane Gladys on October 2, 1975. The master of the Maracaibo, Captain Jose Machado Martinez, testified by deposition on October 11, 1979, part of which was read into the record at trial, that on October 2nd, while passing through the worst of the storm the ship experienced, the Maracaibo was subjected to wind force of 11 to 12 (velocity over 100 miles per hour) and sea force of 9 (waves over 15 meters high) (Tr. 69–71). This testimony was buttressed by the ship's log (Defendants' Exhibit A–2, pp. 6–7) and the United States Mariners Weather Log, a publication of the United States Department of Commerce (Defendants' Exhibit I), both of which indicate that the ship encountered wind force of 11 to 12 and sea force of 9, and by the weather advisories received by the ship reporting sustained winds near the center of the storm as high as 105 knots with gusts to 125 knots (Advisory No. 31 dated October 2, 1975) (Defendants' Exhibit C). The Mariners Weather Log further attests to the severity of the storm, noting that the barometric pressure was "one of the lowest recorded pressure in a hurricane that far north" (p. 72). Finally, defendants' weather expert, Walter Zeltmann, a meteorological consultant, testified that the storm was "extremely well organized and severe" (Tr. 92), that the ship came closest to the eye of the storm on October 2nd, that the distance from the eye at that time was 20 to 40 nautical miles (Tr. 95, 134),[3] that the ship encountered winds of about 100 knots (Tr. 101) and of at least gale force for eight hours and hurricane force (64 knots or higher) for about four to five hours (Tr. 104), and that the sharp drop in pressure reported by the ship and published in the Mariners Weather Log (p. 73) indicates that the ship experienced "very strong winds" (Tr. 104).

Royal Insurance's contention that the ship did not experience weather sufficiently severe to constitute a sea peril is based on the testimony of its expert witness, Captain John Cain. In Captain Cain's opinion "[t]his storm was not as bad as described" by defendants' witnesses because the damages reported by the ship (Defendants' Exhibits E, F, G) did not include the type of damage normally experienced by a ship passing through a severe hurricane (Tr. 308). Specifically, he testified that he would have expected to have seen included in the reports "damage to glass, damage to windows, damage to portholes, lower decks, main decks, even up on the bridge  . . . damage to  . . . lifeboats that sit out there unprotected on the top  . . . [and] bottom damage" due to "pounding" (Tr. 306–07).

Although Royal Insurance is correct that damage to the ship is a consideration in determining whether the ship passed through a storm sufficiently severe to constitute a sea peril. *Freedman & Slater, Inc. v. M. V. Tofevo, supra*, 222 F.Supp. 964, 969 (S.D.N.Y.1963), it is only one factor to be assessed together with the weather and seas reported to have been encountered by the ship, *R. T. Jones Lumber Co. v. Roen Steamship Co., supra*, 270 F.2d 456, 458 (2d Cir. 1959), the size of the ship, *American International Insurance Co. v. The Vessel SS Fortaleza, supra*, 446 F.Supp. 221, 226 (D.P.R.), aff'd per curiam, 585 F.2d 22 (1st Cir. 1978), and the distance travelled at the

---

**3.** Royal Insurance contends through Captain Cain's testimony that the margin of error in Zeltmann's calculations as to the location of the center of the storm with respect to the Maracaibo was fifty to sixty miles (Tr. 311), and not, as Zeltmann claimed, twenty to thirty miles (Tr. 123). Even if Cain was correct as to the margin of error, the storm's center nevertheless came relatively close to the ship, and the more significant evidence, showing that the weather experienced by the ship was very severe, stands.

time, *Freedman & Slater, Inc. v. M. V. Tofevo, supra,* at 968.

Here defendants have introduced testimony of witnesses to the events, documentary records made contemporaneously which there is no reason to doubt, and expert evidence establishing the severity of the storm experienced by the Maracaibo. Captain Cain testified on cross examination that the ship travelled a relatively small distance (72 miles compared to a usual 220 miles during normal weather for the same period) during the storm (Tr. 363–65). Against this evidence the testimony of Captain Cain refutes only one factor and does so on the basis of theoretical inference from the damage reports. Moreover, the damage reports on which he relies do show that the Maracaibo, having undergone over $33,550. worth of repairs which took eleven days to complete, suffered damage considerably more severe than what would occur on a routine voyage.

Accordingly, we find that the Maracaibo passed through weather sufficiently severe to constitute a sea peril within the meaning of COGSA § 4(2)(c), 46 U.S.C. § 1304(2)(c).[4]

### II. Stowage and Securing of the Jeeps

To meet its burden of showing that the jeeps were safely stowed and secured, defendants introduced the deposition testimony of the captain of the Maracaibo and some of its seamen who worked at stowing and securing the cargo as to the method of stowing and securing the jeeps, and the expert testimony of Paul Keeler who gave his opinion that the jeeps were safely stowed and secured (Tr. 199). Royal Insurance contends that the jeeps were negligently stowed and secured in that some were stowed aburton, some were stowed on top of thin plywood on other cargo, and they were not secured with drop shoring, lashing and radial wedges.

### A. The Direction in which the Jeeps were Stowed

■ Royal Insurance argues that the jeeps should have been stowed so that they all faced fore and aft, that is, in the same direction as the ship, and that the stowage of some of the jeeps aburton, or facing either port or starboard, in the square of the hatch (as opposed to in the wings or up against the skin of the ship) was negligent stowage. In support of its contention, Royal Insurance introduced photographs taken of the jeeps aboard the ship while moored at La Guaira which show some of the jeeps in the square of the hatch facing aburton and at times their front ends apparently having dented the sides of other jeeps which faced fore and aft (Plaintiff's Exhibits 4, 8, 11). Moreover, Captain Cain testified that based on the photographs some of the jeeps must have been stowed aburton (Tr. 263–64), a stowage which was negligent because during a voyage the ship rolls from side to side more than it pitches forward and the vehicles are consequently more likely to shift when facing aburton (Tr. 267–68).

Defendants concede that the photographs show that some of the jeeps were stowed aburton in the square of the hatch (Defend-

---

4. Defendants also assert the defense of error in navigation provided in COGSA § 4(2)(a), which provides:

> "(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—
> (a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship."

46 U.S.C. § 1304(2)(a). They argue that Captain Machado could have avoided the storm and that the vessel is accordingly not liable for the damage. However, the only evidence on which defendants rely is the testimony of Captain Machado that the track followed by Gladys was a common one for storms in that part of the world (Defendants' Exhibit A, pp. 46–47). But Captain Machado also testified—and the weather advisories and Mariners Weather Log corroborate—that the storm shifted direction suddenly from the northwest to the northeast so that the attempt to avoid the storm (based on the earlier reports) by sailing eastward was to no avail. We decline to hold as defendants, in effect, urge, that it was erroneous for Captain Machado to chart his course according to the information he had pertaining to the course of Hurricane Gladys instead of according to the path frequently taken by hurricanes in that area.

ants' Reply Memorandum, p. 13). However, they argue that this stowage was not negligent. They contend that, first, Captain Cain conceded that he had stowed vehicles in this manner himself, and second, the effect of the aburton stowage was minimized by the use of wooden cradles surrounding each jeep.

The testimony which defendants claim constituted a concession by Captain Cain follows:

Q Did you ever stow a vehicle, whether it is a jeep or a heavy bus or anything else in the square of the hatch?

A The answer was [sic] yes.

Q Do you ever recall stowing it aburton?

A No, I do not.

Q Is it possible that you may have stowed this heavy vehicle aburton and you don't recall?

A Is it possible that I did it and can't recall?

Q That is right.

A I presume yes.

(Tr. 317). Such testimony is at best understood as meaning that the captain was unwilling to swear that there had never been an occasion (although he did not remember one) when he had stowed vehicles aburton, and not, as defendants urge, that he *had* stowed them that way in the past. Thus, Captain Cain remained firm in his testimony that aburton stowage was improper. Moreover, Cain's position is supported by the testimony of defendants' own expert witness who testified that it was better practice to stow vehicles fore and aft than aburton because of the usual movement of the ship during a voyage (Testimony of Paul Keeler, Tr. 210–11).

Defendants contend that, in any event, their use of cradles in stowing the jeeps protected them adequately. However, although it is not disputed that cradles do reduce the movement of wheeled cargo, the photographs referred to earlier (Plaintiff's Exhibits 4, 8, 11) plainly refute defendants' assertion that the cradles "prevented a movement of the jeeps either sidewards, or backwards and foreward." (Defendants' Reply Memorandum, p. 15).

### B. Stowage on Top of Other Cargo

■ Captain Cain testified that he deduced that some of the jeeps were stowed on a plywood floor that was laid on top of other cargo previously loaded in the ship. His opinion was based on the photographs of the No. 5A 'tween deck (Plaintiff's Exhibits 9, 10, 11) which appear to show wood planks beneath the jeeps and on a comparison of those photographs with that of the No. 4A 'tween deck (Plaintiff's Exhibit 8) which shows the tops of the trucks closer to the coaming than those in the No. 4A deck. Thus it appears that the jeeps in the No. 5A hatch were loaded on top of other cargo. Further support for this opinion is provided by the Daily Hatch Report for the No. 5 Hatch (Exhibit No. 6 to the Thompson Deposition, April 23, 1979, Defendants' Exhibit L). The report shows that a plywood floor was laid on top of previously loaded cargo from 3:30 to 4:00 in the afternoon of September 30, 1975. Since the other cargo loaded below deck that day after 4:00 in that hatch included seventeen of the jeep pickups and five other vehicles, and since the only reason for laying a plywood floor is to stow cargo on top of other cargo (Tr. 276), the inference drawn by Cain is inescapable. Therefore, we find that the seventeen jeep pickups loaded in the No. 5A hatch on September 30th were stowed on a plywood floor on top of other cargo.

The Daily Hatch Report for the No. 4 Hatch (Exhibit 5 to Defendants' Exhibit L) similarly supports Cain's testimony as to the jeeps loaded on the 4B deck. That report shows that a plywood floor was laid on top of previously loaded cargo in the No. 4 hatch. This must have occurred in the 4B deck, because the 4A deck had been loaded with assorted heavy machinery, which was too large to leave room to stow more cargo above it (Tr. 382). The Hatch Report shows that thirteen of the jeep pickups were stowed in the 4B deck after the floor was laid and we find that those jeeps were

stowed on top of other cargo on the 4B deck.[5]

### C. Drop Shoring, Lashing and Wedges

■ Royal Insurance claims that the conceded failure to use drop shoring to secure the jeeps was negligent stowage causing damage to the jeeps. However, defendants' carpentry expert, Alombramo Joseph Barnabae, Sr., testified at deposition on April 23, 1979, that drop shoring is neither necessary nor possible when the hatch is full of cargo, and is normally used when the hatch is partially full to prevent the cargo from moving within the hold (Defendants' Exhibit N, pp. 15, 21–22). Since Royal Insurance has not shown that the hatches were partially empty [6] and therefore required drop shoring, we find that the failure to use drop shoring was not negligent.

Royal Insurance contends that the jeeps were not properly lashed down with wires, basing its contention on the testimony of Captain Cain that if lashing had been used, the photographs of the jeeps aboard the Maracaibo before unloading would have revealed the wires. However, against this circumstantial evidence is the first hand testimony of the captain of the ship (Tr. 51) and the lashing foreman (Barnes Deposition, October 22, 1979, Defendants' Exhibit

P, p. 23) that each jeep aboard the Maracaibo was lashed down. Consequently, the explanation offered—that wires were removed in preparation for unloading before the photographs were taken (Tr. 225)—is persuasive. Accordingly, we find that the jeeps were lashed down.

Finally, Royal Insurance contends that it was negligent not to secure radial wedges against the tires of the jeep pickups. However, Royal Insurance has introduced no evidence showing that the wedges used [7] were not radial shaped. The master testified that the wedges were of "wedge-like form" (Tr. 244), a statement which hardly favors Royal Insurance's position, whatever was its intended meaning. Moreover, Royal Insurance has introduced no evidence showing that even if the wedges used were improperly shaped, the jeeps climbed out of their cradles as a result.

Accordingly, Royal Insurance has not shown that the Maracaibo was negligent in the method of securing the jeeps as to the failure to use drop shoring, lashing, or radial wedges.

### III. Conclusion

■ Although we find for defendants that on October 2, 1975, the Maracaibo passed through a storm sufficiently severe

---

**5.** The lasher foreman, Redmond Barnes, Jr., testified on cross examination at deposition on October 22, 1979 (Defendants' Exhibit P) that there were no platforms used in the hatches (pp. 53, 68 69). The Hatch Reports which state directly to the contrary are entitled to more weight than Barnes' testimony since they were prepared simultaneously with the event *during the course of business and were not, as* was the testimony, based on memory of an incident four years old.

Defendants contend that Captain Machado and the lasher, Verian Dunbar, Jr., testified that the jeeps were stowed on the decks. The master's testimony on which defendants rely was that it was not good practice to stow cargo higher than the hatch coamings because of the danger of it "get[ting] creamed" (Tr. 246). He did not say that the jeeps were stowed on the deck directly. Dunbar did state that the cargo *that he stowed* in the No. 4 'tween deck was placed directly on the deck (Defendants' Exhibit O, April 23, 1979, p. 50). However, there was no evidence that he stowed all the cargo that was placed in the No. 4 hatch, so that, consistent

with his testimony, there could have been cargo stowed in that hatch on plywood floors that Dunbar did not stow.

**6.** Royal Insurance admits that in those hatches in which it claims the jeeps were loaded on top of other cargo, drop shoring would have been impossible. Post-Trial Brief Submitted on Behalf of Plaintiff, *Royal Insurance Company, Ltd.,* p. 25.

Defendants argue that it can be concluded from the stowage plan that the squares of the hatches were all full (Exhibit No. 1 to Defendants' Exhibit L). However, it is not apparent from that document that drop shoring was inappropriate in all the hatches on the Maracaibo. Nevertheless, this does not alter the conclusion that Royal Insurance has not shown that drop shoring should have been used.

**7.** No evidence was introduced to refute the eyewitness testimony of Captain Machado (Tr. 243–44) and Barnes (Defendants' Exhibit P, pp. 8, 42–45, 51, 75) that wedges were used.

to constitute a peril of the sea within the meaning of section 4(2)(c) of COGSA, 46 U.S.C. § 1304(2)(c), that the failure to use drop shoring was not negligent, and that the jeeps were properly lashed and wedged, we find for Royal Insurance that the jeeps were negligently stowed because of the aburton stowage[8] and stowage on top of plywood flooring resting on other cargo.

Captain Cain's testimony supplied the causal link between the negligent stowage and the damage to the jeeps:

"Q   Captain, on the basis of the information that you have reviewed, would the trucks have been stowed and secured in such a way as to survive the weather conditions that have been reported at this trial?

THE COURT: Have you been present throughout the trial?

THE WITNESS: Yes, I have.

THE COURT: You heard the testimony? You not only read the material, but you heard the testimony of the captain with regard to the severity of the storm?

THE WITNESS: Yes, sir.

THE COURT: You heard the testimony of the weather experts yesterday regarding the storm?

THE WITNESS: Yes, sir, I did.

THE COURT: Do you understand the question put to you?

THE WITNESS: I understand the question is if this cargo was properly stowed and secured, could it have survived this voyage without damage?

MR. FENZEL: That is correct.

THE WITNESS: Yes, it could have, it should have."

(Tr. 261–62).   Since Cain's testimony was credible, and since defendants produced no evidence showing that the same damage would have occurred even if the jeeps were properly stowed and secured (the testimony of defendants' expert was limited to the question whether the stowage and securing was negligent), we find that the negligent stowage proximately caused damage to the jeeps.

Since " 'although the loss occurs by a peril of the sea, yet if it might have been avoided by skill and diligence at the time the carrier is liable,' " *Nichimen Co. v. M.V. Farland,* 462 F.2d 319, 330 (2d Cir. 1972) (quoting *Clark v. Barnwell,* 53 U.S. (12 How.) 272, 280, 13 L.Ed. 985 (1851)), we find that defendants are liable under the circumstances.[9]

This memorandum constitutes the court's findings of fact and conclusions of law as to liability required by Rule 52(a) of the Federal Rules of Civil Procedure.

The issue of damages will be referred to Honorable Naomi R. Buchwald, Magistrate of this court, to conduct an inquest.

It is so ordered.

---

8. It is impossible to determine from the photographs which establish the aburton stowage (Plaintiff's Exhibits 4, 8, 11) precisely what percentage of the jeeps were stowed in that direction, but it is clear that the proportion was high.

9. The issue whether Royal Insurance, as subrogee, may recover the full amount alleged as damages (which is more than it paid to the insured) was raised in Defendants' Trial Memorandum, pp. 31–32, and briefly discussed at trial (Tr. 23–24). Since the parties did not mention it in their post trial briefs and Royal Insurance has not yet responded on this question, its determination will await decision as to damages.