**INDIA SUPPLY MISSION, Libelant,**

v.

**S.S. OVERSEAS JOYCE and Overseas Carriers Corporation, Respondents.**

United States District Court
S. D. New York.
Sept. 30, 1965.

Baker, Nelson, Williams & Mitchell, by Robert M. Atkinson, New York City, for libelant.

Dougherty, Ryan, Mahoney & Pellegrino, by Robert J. Giuffra, New York City, for respondent.

TYLER, District Judge.

On October 4, 1963, India Supply Mission filed a libel against S.S. "Overseas Joyce" and its owner, Overseas Carriers Corporation (hereinafter collectively referred to as "respondent"), as a result of the following sequence of events. On July 20, 1962, India Supply Mission had delivered to respondent a freight shipment consisting essentially of six locomotives at the Port of Chicago for delivery to the Port of Bombay. Concededly, the freight was in good condition when delivered. Libelant alleges, however, that when the shipment arrived in Bombay, a number of the locomotives were dented, broken, bent, scratched and otherwise damaged, thereby requiring a total recovery in the amount of $55,000.

Pursuant to Rule 58 of the General Admiralty Rules, respondent here seeks summary judgment. For the purposes of this motion, however, respondent admits only that one locomotive was damaged and, subject to the provisions contained in the bill of lading, admits its liability for this locomotive. Since libel-

ant does not confine its claim for damages to one locomotive, respondent's motion is treated as a motion for partial summary judgment pursuant to Rule 58.

Before turning to the merits of the application, one other possibly relevant fact should be mentioned. For the voyage in question, the S.S. "Overseas Joyce" had been chartered to Star Line Agency, Inc. and Kuludundis Lines, Ltd.; thus, respondent was not a participant in the negotiations between libelant and the charterers respecting freight charges for the locomotives. After libelant's petition was filed, both Star Line and Kuludundis went into bankruptcy proceedings, thus rendering respondent, as a practical matter, the sole responsible party for any damage which may have occurred during the voyage.

Clause 29 of the bill of lading incorporated therein the Carriage of Goods by Sea Act ("COGSA") provisions for limitation of liability to $500 "per package", or in the case of goods not shipped in packages, $500 "per customary freight unit".

It is undisputed that the locomotive concededly damaged was not a "package" within the meaning of the Act. The parties are in agreement that the phrase "per customary freight unit" is applicable; their difference arises as to the meaning of "customary freight unit".

Respondent contends that the bill of lading is broken down into six separate cargo or freight units—one for each locomotive—and thus its maximum liability per unit would be $500 in accordance with the COGSA limitation provision.

Libelant argues that it is not sufficient to look at the bill of lading alone, particularly where there are extrinsic facts which would overcome the presumptive accuracy of the bill's recitals. More particularly, although it concedes that respondent was not a party to this negotiation, libelant offers in support of this contention an affidavit of a Mr. Christophides who, at the time the freight charges were negotiated, was a director of the Star Line Agency in charge of

that firm's department responsible for handling such negotiations. In his affidavit, Christophides states in relevant part that:

" * * * the freight to be charged was negotiated between the parties and was determined by utilizing our tariff rate and multiplying it by approximately 200 revenue units. A revenue unit consists of 40 cubic feet by volume or 2240 pounds. We then added heavy lift charges and allowed a trade discount of 30% given the Government of India by most carriers in the trade. The resultant figure was then rounded out to a lump sum of $7,000 per locomotive, which was listed as the freight rate on the contract."

From this, libelant jumps to the conclusion that each "revenue unit" must be considered to be the "customary freight unit" applicable to this shipment—a conclusion which would have the interesting effect of expanding respondent's potential liability per locomotive to approximately $100,000. Perhaps anticipating that such a conclusion might not be unreservedly accepted upon this record, libelant additionally urges that, in any event and at the very least, the Christophides affidavit is enough to render determination of the "customary freight unit", at least for the purposes of this case, a question of fact.

 In admiralty as well as civil causes, summary judgment will lie where there is no genuine issue of material fact and the moving party is entitled to prevail as a matter of law. See Kalyvakis v. The Olympia, 181 F.Supp. 32 (S.D.N.Y. 1960). To be sure, the party opposing the motion is to be given the benefit of all reasonable doubt in determining whether a genuine fact issue exists. United States v. Farmers Mut. Ins. Ass'n of Kiron, 288 F.2d 560 (8th Cir. 1961); Chesapeake & O. Ry. Co. v. International

Harvester Co., 272 F.2d 139, 142 (7th Cir. 1959); Heyward v. Public Housing Administration, 238 F.2d 689, 696 (5th Cir. 1956). Nevertheless, after giving libelant this benefit, I conclude that there remain no genuine fact issues to bar resolution of respondent's motion.

In support of this conclusion, it should be borne in mind that respondent does not argue that the method described by Mr. Christophides in his affidavit was not the basis used for arriving at the $7,000 per locomotive freight charge recited on the face of the bill of lading.[1] Rather, respondent points out that, whatever method—calculation of revenue units or otherwise—may have led the negotiators to finally agree upon a freight charge, the latter was clearly fixed at $7,000 per locomotive. Such is plainly recited in the bill of lading, and nothing in Christophides' affidavit demolishes or rebuts that ultimate fact. The dispositive question, then, is what was the "customary freight unit" upon the circumstances then pertaining, and this would appear to be a problem of law.

While no one of them is on all fours with the facts here presented, there are several cases which have shown a strong inclination to place heavy reliance on the bill of lading provisions in determining the "customary freight unit". Freedman & Slater, Inc. v. M. V. Tofevo, 222 F.Supp. 964, 973 (S.D.N.Y.1963); see also e. g., Waterman S.S. Corp. v. United States S. R. & M. Co., 155 F.2d 687 (5th Cir. 1946); Middle East Agency, Inc. v. The John B. Waterman, 86 F. Supp. 487 (S.D.N.Y.1949); Gulf Italia Company v. The Exira, 160 F.Supp. 956 (S.D.N.Y.1958). Libelant seems to implicitly admit that this is so by pressing this court to look to extrinsic circumstances—i. e. the Christophides affidavit —to determine the "customary freight unit". Unless the authorities compel a contrary result, therefore, it would ap-

---

1. In pertinent part, the bill states:
"6 units at $7,000 each $42,000.00
Tolls 1,394,904
.90/2000# <u>627.71</u>
Freight to be prepaid $42,627.71"

pear that respondent's position should be adopted by this court, particularly inasmuch as respondent was not and could not have been a party to negotiations concerning freight charges including, of course, the subject of limitation of liability.

In a case similar to this one, it was held that the "customary freight unit" should be the locomotive itself. Isbrandtsen Co. v. United States, 201 F.2d 281 (2d Cir. 1953). There ten locomotives were shipped from one port to another and damaged in transit. Because the shipment was from one foreign port to another, the trial and appellate courts agreed that the COGSA limitation provisions were not directly applicable. Nevertheless, the carrier had written into the bill of lading the same limitation language as set forth in COGSA; the courts, thus, gave it full and binding effect as a matter of contract between the parties. The carrier's position in Isbrandtsen that the "customary freight unit" was a locomotive was upheld by both courts, the appellate court saying, "The evidence clearly shows that the rate was calculated at $10,000 per unit of locomotive and tender." Isbrandtsen Co. v. United States, supra, at 286. The "evidence" referred to was the bill of lading.

The words "customary freight unit", it is true, have been interpreted to mean the unit upon which the charge for freight is computed and not the shipping unit. Waterman S.S. Corp. v. United States Smelting, Refining & Mining Co., 155 F.2d 687 (5th Cir. 1946); Brazil Oiticica Ltd. v. The Bill, 55 F.Supp. 780 (D.C.Md.1944). But, as has been pointed out, it seems clear that the unit for computing freight here was coincidentally the same as the shipping unit—one locomotive. See Isbrandtsen Co. v. United States, supra.

In an analogous case decided comparatively recently, this court rejected another libelant's contention that the "customary freight unit" was a cubic meter of an automobile. Freedman & Slater v. M. V. Tofevo, 222 F.Supp. 964 (1963). In theory, libelant's prime contention here is identical to the argument struck down in Freedman where it was shown that the freight charge per automobile shipped had been computed by multiplying the tariff rate by a stipulated number of cubic meters. Nevertheless, the court there concluded that each automobile and not each cubic meter of automobile was the "customary freight unit" for the purpose of limitation of liability.

Similarly, the case of Caterpillar Americas Co. v. S.S. Sea Roads, 231 F.Supp. 647 (S.D.Fla.1964), while recognizing the accepted definition of "customary freight unit" as that unit upon which the charge for freight is computed and not the shipping unit, held that the carrier's liability for damage to a tractor was limited to $500—i. e., that liability should be based not upon the hundredweight unit used in part to compute freight charges but upon a single tractor which was recited as the freight unit in the documents.

The weight of authority in this area, then, appears consistent with respondent's position here. Further support for respondent's position may be found by looking to well-known policy considerations underpinning the COGSA limitation of liability provisions. That language, of course, was intended to limit the liability of common carriers if inserted in a bill of lading unless the shipper declared a higher value on the goods and paid a higher rate. Libelant's position would tend to negate that purpose. If all six locomotives in this case were significantly damaged and if libelant's theory of "customary freight unit" as one revenue unit were accepted, the carrier's maximum exposure would be $600,000. In the light of the freight charges actually agreed upon and paid, it is hard to believe that such a possible result was intended by the immediate parties to the transaction. It is even more difficult to hold that respondent should be bound by such an arrangement.

It is determined, thus, that the "customary freight unit" in this case is one locomotive. Respondent's motion is granted, and an order and judgment should be entered limiting respondent's liability on the one locomotive which concededly was damaged to the sum of $500.