**GENERAL MOTORS CORPORATION,**
Plaintiff,

v.

**S.S. MORMACOAK, her engines, boilers, etc., Moore-McCormack Lines, Inc. and American Republics Line, Defendants.**

**No. 65 AD 617.**

United States District Court,
S. D. New York.

May 6, 1971.

Donovan, Donovan, Maloof & Walsh, New York City, for plaintiff; Francis V. Elias, Donald M. Kennedy, New York City, of counsel.

Dougherty, Ryan, Mahoney, Pellegrino & Guiffra, New York City, for defendants; Robert J. Giuffra, New York City, of counsel.

## OPINION

BONSAL, District Judge.

Plaintiff, the owner of an electric generator, brings an action in admiralty against defendant, the owner of the S.S. MORMACOAK, for damage to the generator when it was dropped during discharge from the vessel in Fortaleza, Brazil, and fell into the sea.

Defendant contends: (1) that the damage to the generator was the result

of one of the causes enumerated in § 4(2) of the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1304(2) for which defendant is not liable; and (2) that the liability, if any, of defendant is limited to $500 pursuant to § 4(5) of COGSA, 46 U.S.C. § 1304(5).

By agreement between the parties, the issue of limitation of any liability was first tried to the court, defendant indicating that it would concede liability in the event the court held that its liability was limited to $500.

It appears from the stipulation of the facts that on or about June 23, 1964, the defendant received the generator, one of two which along with a control unit comprised a power plant, in apparent good order and condition at its Brooklyn, New York terminal, for carriage to Fortaleza, Brazil. A dock receipt issued on plaintiff's letterhead included the following handwritten entries:

| No. and Kind of Package | Said to Contain |
|---|---|
| 3 Pieces | One Power Plant Consisting of (2) Generator Units (1) Control Unit |

Thereafter, on June 23, 1964, defendant issued its on deck bill of lading, No. 6, evidencing the contract of carriage between the parties. The bill of lading included the following entries:

| No. of Pkgs. | Shipper's Description of Packages and Goods |
|---|---|
| 3 | Pieces } One Power Plant Consisting of: (2) Generator Units (1) Control Unit |

The power plant was loaded on board the S. S. MORMACOAK, the 2 generators being stowed on deck. Each generator was enclosed in a metal housing and was mounted on a steel base. Plaintiff's "specifications" for the power plant state that "the generating unit is mounted on a fabricated rolled steel base with provisions for lifting and jacking and is enclosed in a sound-insulated, weatherproof steel enclosure."

Freight was paid for the entire shipment on the following basis:

| Berth term rate | $24,750.00 |
|---|---|
| Surcharge at $8.00 per ton w/m | 2,500.20 |
| Total freight paid | $27,250.20 |

The vessel arrived at Fortaleza on July 7, 1964 and proceeded to discharge the power plant. One of the two generators was discharged without incident. However, while the second generator was being discharged by use of the ship's gear, it fell into the sea causing damage in excess of $500.

Issues presented are: whether the generator was a "package," or, if not, whether the power plant was a "customary freight unit" within the meaning of § 4(5) of COGSA, which provides:

"Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package * * * or in the case of goods not shipped in packages, per customary freight unit * * * unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading."

COGSA does not apply *ex proprio vigore* to the carriage of "cargo which by the contract of carriage is stated as being carried on deck and is so carried." § 1(c) of COGSA, 46 U.S.C. § 1301(c); Pannell v. The S. S. American Flyer, 157 F.Supp. 422 (S.D.N.Y.1957), modified on other grounds sub nom., Pannell v. United States Lines Company, 263 F.2d 497 (2d Cir.), cert. denied, 359 U.S. 1013, 79 S.Ct. 1151, 3 L.Ed.2d 1037 (1959). However, its terms are incorporated by reference in clause 6 of the bill of lading, which provided:

"6. In respect of goods carried on deck and stated herein to be so carried, all risks of loss or damage inherent in such carriage, shall be borne by the shipper and consignee but in all other respects shall be governed by the terms of this bill of lading and the provisions stated in the United States Carriage of

Goods by Sea Act, 1936, notwithstanding Sec. 1(c) thereof."

In view of Clause 6, the provisions of COGSA became part of the contract evidenced by the bill of lading. Pannell v. United States Lines Company, *supra* at 498.

Clause 13 of the bill of lading provided:

"13. In case of any loss or damage to or in connection with goods exceeding in actual value $500 * * * per package, or, in the case of goods not shipped in packages, per customary freight unit, the value of the goods shall be deemed to be $500 per package or per unit, on which basis the freight is adjusted and the carrier's liability in any capacity, if any, shall be determined on a value of $500 per package or per customary freight unit, unless the nature of the goods and a valuation higher than $500 shall have been declared in writing by the shipper upon delivery to the carrier and inserted in this bill of lading and extra freight paid if required * * *."

Since no higher value was declared by the plaintiff, defendant is entitled to limitation of liability to $500 if the generator constituted a "package" or if the power plant of which the generator was a part was a "customary freight unit."

■ The evidence established that the generator did not have a skid or any packaging preparation designed for its transportation or to facilitate its handling. The fact that the bill of lading stated that the "No. of Pkgs." was 3 is not conclusive, Middle East Agency v. The John B. Waterman, 86 F.Supp. 487, 491 (S.D.N.Y.1949), and on all the evidence the court cannot conclude that the generator was a "package" within the meaning of § 4(5) of COGSA. *Compare* Petition of Isbrandtsen Company, 201 F. 2d 281 (2d Cir. 1953); Gulf Italia Company v. The Exiria, 160 F.Supp. 956 (S.D.N.Y.1958) aff'd sub nom. Gulf Italia Company v. American Export Lines, Inc., 263 F.2d 135 (2d Cir. 1959); Caterpillar Americas Company v. S. S. Sea Roads, 231 F.Supp. 647 (S.D.Fla. 1964); and Middle East Agency v. The John B. Waterman, *supra*, *with*— Aluminios Pozuelo Ltd. v. S. S. Navigator, 277 F.Supp. 1008 (S.D.N.Y.1967), aff'd, 407 F.2d 152 (2d Cir. 1968).

Since the generator was not a "package," the court must consider whether the power plant was a "customary freight unit" within the meaning of § 4(5) of COGSA.

It appears from the stipulation of the facts that in 1963, plaintiff advised the River Plate and Brazil Conference of a prospective order for 6 power plants (each consisting of two generator units and one control unit) expected to be shipped to Fortaleza and Recife, Brazil, and requested the Conference to fix a rate to be charged by Conference members for carriage of these units via ocean steamer to their respective destinations. By letter dated June 19, 1963, the Conference offered to plaintiff a special berth term rate of $24,750. for each power plant shipped to Fortaleza, advising that the special berth term rates were "subject to all surcharges in effect at time of shipment," and that they estimated the surcharge for each power plant would approximate $2500, thereby making a total for Fortaleza of $27,250 for each power plant. In 1963–1964, defendant was a member of the Conference and plaintiff was a "contract shipper."

By letter of June 24, 1963, plaintiff advised the Conference that it would prefer that one lump sum rate per power plant, including all surcharges, be established. After discussing plaintiff's suggestion with its members, the Conference advised plaintiff by letter dated July 2, 1963 that its members were not willing to establish a fixed quotation "due to the presently existing highly uncertain labor conditions in Brazil." The letter continued:

"In order to assist you in determining the amount of surcharge in each in-

stance, we call your attention to the fact that surcharges do not apply on heavy lift and extra length charges. This would mean that whatever port surcharges are in effect at the time of shipment would be applicable against the freight rate of $44.00 W/M to Santos and Recife and $53.00 W/M to Fortaleza, which is the basic project rate used for computation in these instances.

"At the time of writing, there are no port surcharges in effect for either Recife or Fortaleza and none are under contemplation. * * *

"Finally, there is presently a general surcharge to all Brazilian ports of $8.-00 per ton W/M. This amount is not included in lump sum figures given to you in our letters of June 19, 1963, and must be added. This figure is not subject to the port surcharges, inasmuch as we do not assess a surcharge on a surcharge. However, it should be noted this figure of $8.00 W/M could change up or down between now and the time of actual shipment, and would have to be figured accordingly.

Thereafter, plaintiff accepted the Conference's special berth term rate specified in its letter of June 19, 1963. A memorandum which was filed by the Conference with the Federal Maritime Commission as an amendment to the Conference's freight tariff, states in pertinent part:

"Berth term rates are established, subject to all surcharges in effect at the time of shipment, for six (6) Power Plants * * * To Fortaleza —$24,750.00 each."

In the first reported judicial interpretation of the term "customary freight unit," The Bill, 55 F.Supp. 780, 783 (D.C.Md.1944), aff'd, 145 F.2d 470 (4th Cir. 1944), the court stated that "the phrase 'per customary freight unit' in this context in the light of its legislative history, refers to the unit of quantity, weight or measurement of the cargo customarily used as the basis for the calculation of the freight the rate to be charged." In Petition of Isbrandtsen Company, supra, 201 F.2d at 286, the Court of Appeals for this Circuit recognized that, "The authorities have construed the words 'customary freight unit' to refer to the unit upon which the charge for freight is computed and not to the shipping unit."

Plaintiff has been unable to produce the original bill of lading, so that it is not possible to resolve the dispute between the parties as to whether the bill of lading specified a "flat rate" for the power plant of which the generator was a part. Defendant contends that it was a flat rate in view of the filed tariff, while plaintiff contends that it was not because plaintiff computes the surcharge of $2,500.20 at $8.00 per weight measurement ton of the power unit and computes the basic rate of $24,750. at $53 per weight measurement ton. Plaintiff says that the "customary freight unit" was "the standard weight measurement ton of forty cubic feet," applicable both to the basic rate and to the surcharge. However, the amended tariff quoted "Berth term rates * * * subject to all surcharges * * * for six (6) Power Plants * * * To Fortaleza —$24,750.00 each." (Emphasis added.) The amended tariff makes no reference to "the standard weight measurement ton of forty cubic feet" but, on the contrary, establishes a flat rate for each power plant. In Freedman & Slater, Inc. v. M. V. Tofevo, 222 F.Supp. 964 (S.D.N.Y.1963), Judge Croake rejected an argument similar to that here advanced by the plaintiff, stating, at 972:

"It should be noted that the freight rate per cubic meter assertedly used in computing the freight charge for each model of Goggomobile shown on the tariff does not appear anywhere on the tariff. * * * It is also significant that the letters 'ea.,' an abbreviation for the word 'each,' appear after each

**670**

quotation on the tariff, indicating that the quotation of the freight rate is in terms of each vehicle and not in terms of each cubic meter."

In view of the filed tariff, the "customary freight unit" was the entire power plant, since it was on the entire power plant that the rate was computed and filed. Freedman & Slater, Inc. v. M. V. Tofevo, *supra*; India Supply Mission v. S.S. Overseas Joyce, 246 F.Supp. 536 (S.D.N.Y.1965). As the court stated in India Supply Mission, *supra* at 539:

> "[W]ell-known policy considerations underpinning the COGSA limitation of liability provisions. * * * [were] intended to limit the liability of common carriers * * * unless the shipper declared a higher value on the goods and paid a higher rate."

There was testimony at the trial that if the special rate had not been authorized by the Conference at plaintiff's request, the freight charge would have been approximately $33,445.28 as compared to the total actual charge of $27,250.20.

If plaintiff had wished to avoid the limitation per "customary freight unit," it could have declared a higher value on the power plant and paid a higher rate under Clause 13 of the bill of lading and § 4(5) of COGSA which was incorporated by reference.

■ In view of the foregoing, the court finds that the freight charge was computed on the entire power plant, which was a "customary freight unit," so that plaintiff's recovery must be limited to $500. *Petition of Isbrandtsen Company, supra.*

The foregoing constitutes the court's findings of fact and conclusions of law (Rule 52(a), F.R.Civ.P.). As defendant has indicated that it would concede liability if the court held that its liability was limited to $500., the parties may settle a judgment in favor of the plaintiff in the amount of $500. and costs.

*Settle judgment on notice.*