**GENERAL MOTORS CORPORATION,**
Plaintiff-Appellant,

v.

**MOORE–McCORMACK LINES, INC.,**
Defendant-Appellee.

No. 190, Docket 71-1675.

United States Court of Appeals,
Second Circuit.

Argued Nov. 1, 1971.

Decided Nov. 17, 1971.

Donald M. Kennedy, New York City (Donovan, Donovan, Maloof & Walsh, Francis V. Elias, New York City, of counsel), for plaintiff-appellant.

Robert J. Giuffra, New York City (Dougherty, Ryan, Mahoney, Pellegrino & Giuffra, Peter J. Zambito, New York City, of counsel), for defendant-appellee.

Before WATERMAN, SMITH and TIMBERS, Circuit Judges.

PER CURIAM:

General Motors brought this action in admiralty against Moore-McCormack Lines, owner of the SS MORMACOAK, for damages suffered when an electric generator, one component of a General Motors power plant being shipped from New York to Brazil, was dropped into harbor waters during discharge from the ship. Pursuant to the relevant provisions of the United States Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1300 et seq., the United States District Court for the Southern District of New York (Dudley B. Bonsal, Judge), awarded General Motors (GM) $500 for the damage. The opinion is reported at 327 F.Supp. 666 (S.D.N.Y. 1971). GM claims that the district court erred in failing to assess $60,000 damages against Moore-McCormack. We affirm the judgment of the district court.

The tariff in effect when the power plant was loaded on board the SS MORMACOAK in June 1964 reflected a freight charge of $24,750 per power plant, plus surcharges of $8.00 per weight measurement ton for use of the Brazilian ports. The bill of lading described the cargo as "3 pieces—One Power Plant, consisting of (2) Generator units [and] (1) Control unit." Section 6 of the bill of lading incorporated the Carriage of Goods by Sea Act into the contract,[1] and section 13 was a limitation of liability provisions similar to the COGSA provision, 46 U.S.C. § 1304 (5).[2] Under the terms of that provision,

the owner of cargo is entitled to recover $500 for each damaged "package or * * * customary freight unit." The district court found that the generator was not a package, but that an entire power plant was the customary freight unit for the transaction. Neither party appeals from the decision on the "package" issue, but GM claims that the court erred in refusing to hold that the standard weight measurement ton was the freight unit.

The phrase "package or * * * customary freight unit" in COGSA was a variation from the phrase used in the limitation of liability section of the international maritime rules which were the basis for the statute.[3] In the absence of legislative history on the meaning of the phrase, the courts have held that customary freight unit refers not to the shipping unit, but to the unit of the cargo "customarily used as the basis for the calculation of the freight rate to be charged." Brazil Oiticica Ltd. v. The Bill, 55 F.Supp. 780, 783 (D.Md. 1944); Petition of Isbrandtsen, 201 F.2d 281 (2d Cir. 1953); Stirnimann v. The San Diego, 148 F.2d 141 (2d Cir. 1945); India Supply Mission v. S.S. Overseas Joyce, 246 F.Supp. 536 (S.D.N.Y. 1965).

The amended tariff in this case quoted the berth term rate for six power plants to Fortaleza, excluding surcharges, at $24,750 each. The courts have shown a "strong inclination to place heavy reliance on the bill of lading provisions in determining the 'custom-

---

1. This clause is necessary because COGSA in its own terms does not apply to "cargo which by the contract of carriage is stated as being carried on deck and is so carried." 46 U.S.C. § 1301(c). Pannell v. The SS American Flyer, 157 F. Supp. 422 (S.D.N.Y.1957), modified on other grounds, sub nom. Pannell v. United States Lines Co., 263 F.2d 497 (2d Cir.), cert. denied, 359 U.S. 1013, 79 S.Ct. 1151, 3 L.Ed.2d 1037 (1950). The generators were carried on deck, and the bill of lading provided for such carriage.

2. The clause provided in pertinent part: 13. In case of any loss or damage to or in connection with goods exceeding in actual value $500 * * * per package or * * * per customary freight unit * * * the carrier's liability in any capacity, if any, shall be determined on a value of $500 per package or per customary freight unit, unless the nature of the goods and a valuation higher than $500 shall have been declared in writing by the shipper * * * and inserted in the bill of lading. * * *

3. The limitation of liability provision in the Hague Rules, formulated in 1924, used the phrase "package or unit." Knauth, Ocean Bills of Lading, pp. 77–78 (1953).

ary freight unit'." [4] *India Supply Mission, supra,* 246 F.Supp. at 538. *See* Freedman & Slater, Inc. v. M. V. Tofevo, 222 F.Supp. 964 (S.D.N.Y. 1963); Gulf Italia Company v. The Exiria, 160 F.Supp. 956 (S.D.N.Y. 1958), aff'd sub nom. Gulf Italia Company v. American Export Lines, Inc., 263 F.2d 135 (2d Cir.) cert. denied, American Export Lines, Inc. v. Gulf Italia Co., 360 U.S. 902, 79 S.Ct. 1285, 3 L.Ed.2d 1254 (1959). Although, as GM claims, the 40 cubic foot ton is one factor utilized in computing the charge, it does not thereby become the freight unit for the transaction.[5] Analysis of the relevant factors supports the view of the district court that the entire power plant was the freight unit for the $24,750 charge.

The surcharge, however, which is listed as freight on the bill of lading, is based on a freight unit of one weight measurement ton. GM claims that this unit, employed in calculating one portion of the charge, is a more customary freight unit than the power plant and ought to be held the unit for the whole transaction. This conclusion is unwarranted. The surcharge comprises less than 10% of the total freight charge for a power plant and is levied on all those using Brazilian ports.[6] Where, as in this case, the principal charge is based on a description of the items of cargo as one unit (a power plant) and the freight is calculated on the basis of that unit, the presence of additional incidental charges computed on another basis ought not disturb the determination that the unit underlying the main charge is the customary freight unit.

 The decision to limit the carrier's liability to $500 is also in accord with one guiding policy behind the Carriage of Goods by Sea Act—to limit liability of common carriers for damage to cargo where the value of the cargo is not known to the carrier. If a shipper wishes to avoid this $500 limit, he may declare a higher value, thus alerting the carrier of its potential liability and allowing it to charge extra freight, if appropriate. This option was open to GM; by declaring the value of the generators, it could have made Moore-McCormack an insurer up to that value. Having failed to do so, it cannot now complain of the limitation on recovery.

Judgment affirmed.

4. Neither party produced the original bill of lading at trial. However, a copy of the bill produced quoted the rate as it appeared on the tariff.

The presence of the word "each" after the description of the object being shipped and the lack of mention of the weight measurement ton on the tariff are also factors to be taken into account. Freedman & Slater, *supra,* 222 F.Supp. at 972.

5. This is particularly so where, as here, the charge is several thousand dollars less than it would have been if computed on

the basis of the standard fixed rate per weight measurement ton of cargo.

6. In *India Supply Mission, supra,* the bill of lading listed Seaway tolls as part of the freight charge. These tolls are calculated on the basis of factors set out in 33 U.S.C. §§ 981–990, particularly § 988 (b). And these factors differ from the freight unit underlying the main charge for the cargo. In determining the freight unit for COGSA purposes, the court disregarded the tolls and used the unit underlying the main charge.