HARTFORD FIRE INSURANCE COM-
PANY, Plaintiff-Appellant,

v.

PACIFIC FAR EAST LINE, INC., a cor-
poration, the vessel PACIFIC BEAR her
hull, tackle, apparel and furniture and
Doe One through Doe Three, Defend-
ants-Appellees.

No. 71–2856.

United States Court of Appeals,
Ninth Circuit.

Feb. 4, 1974.

Stephen McReavy, John E. Droeger (Argued), Hall, Henry, Oliver & Mc-Reavy, San Francisco, Cal., for plaintiff-appellant.

George L. Waddell, Harvey I. Wittenberg (Argued), Dorr, Cooper & Hays, San Francisco, Cal., for defendants-appellees.

Before CHAMBERS, CHOY and WALLACE, Circuit Judges.

CHOY, Circuit Judge:

Appellant, Hartford Fire Insurance Company (Hartford) appeals from an interlocutory judgment limiting the liability of appellee, Pacific Far East Lines (PFEL), to $500 for damage to an electrical transformer shipped aboard appellee's vessel, the SS Pacific Bear. Judgment was granted after a separate trial held pursuant to F.R.Civ.P. 42(b) and jurisdiction resides here under 28 U.S.C. § 1292(b). We reverse.

The sole question presented for review is whether the large electrical transformer, attached by bolts to a wooden skid but not otherwise boxed or crated, constituted a "package" within the meaning of Section 4(5) of the Carriage of Goods by Sea Act (*COGSA*). 46 U. S.C. § 1304(5).[1]

Hartford's subrogor, the Black Construction Company (Black), ordered a 10,000 KV transformer from the General Electric Company. The transformer measured 13 feet 1 inch in height, 11 feet 7 inches in length, 7 feet 8 inches in width, and weighed some 36,700 pounds. Intended for use outdoors, the transformer was designed to stand freely on the ground or other flat surface. As a part of its normal manfacuring process, integral lifting lugs were attached to the transformer's four upper corners for purposes of its movement and transportation. Although it was thus suited and intended for handling and transporting, at the specific request of Black, General Electric also mounted and bolted the transformer to a heavy wooden skid in order to protect it during shipment. Thus fastened to its skid, the transformer was transported by railroad flatcar to San Francisco where it was loaded aboard PFEL's vessel for its destination, Agana, Guam.

The transformer was delivered to PFEL undamaged, but en route to Guam its low-voltage bushings were extensively damaged and water vapor entered the transformer. The cost of repairing this damage, alleged to be in excess of $5,000, was reimbursed by Hartford to Black, for which Hartford now seeks recovery from PFEL. PFEL admits liability, but maintains that because the skidded transformer was a "package" it is liable only up to the $500 maximum limit of the statute, since no value for the cargo in excess of this amount was declared in the bill of lading. Hartford

1. 46 U.S.C. § 1304(5) provides: "Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier.

"By agreement between the carrier, master, or agent of the carrier, and the shipper another maximum amount than that mentioned in this paragraph may be fixed: *Provided*, That such maximum shall not be less than the figure above named. In no event shall the carrier be liable for more than the amount of damage actually sustained."

argues that the transformer as skidded was not a "package" within *COGSA's* definition where the transformer was not attached to the skid for purposes of its handling or transportation, but solely for the protection of the transformer. We do not accept Hartford's rationale for defining a "package," but we nevertheless conclude that the transformer was "not shipped in [a] package," and accordingly reverse and remand for a determination of PFEL's liability according to the number of customary freight units applicable to the transformer.

*COGSA* was enacted in 1936,[2] more than a decade after the principles embodied in the act had been agreed upon and ratified by the United States along with other commercial nations at the Ocean Bill of Lading Convention in Brussels. Commonly known as the the Hague Rules, the central purpose of these earlier agreements was to establish international uniformity in certain matters relating to ocean bills of lading, on a basis fair to ocean carriers, cargo owners, insurers and bankers. Hearings on S.B. 1152 before the Committee on Commerce, U. S. Senate, 74th Cong., 1st Sess. on a Bill relating to Carriage of Goods by Sea, 15 (1935) [hereinafter *Hearings*]. Arrived at after long and deliberate negotiations, both the Hague Rules and the later statute were effected by compromise among the various interested parties. Then existing law was modified by *COGSA* to give greater protection to the cargo interests in several respects. The most significant of these were: (1) when goods were received by the carrier in sound condition but were delivered damaged, the burden of proof was placed on the carrier to show how the damage occurred and that the carrier was not responsible therefor; (2) owners of goods were allowed adequate time within which to file claims against the carriers where damage occurred; and (3) the carriers were to accept greater liability for damages per package without a corresponding increase in freight rates.[3] *Hearings, supra* at 18; *see* Pan-Am Trade & Credit Corp. v. The Campfire, 156 F.2d 603 (2d Cir.), cert. den. sub nom., Waterman Steamship Corp. v. Pan-American Trade & Credit Corp., 329 U.S. 774, 67 S.Ct. 194, 91 L.Ed. 666 (1946).

The language of the Hague Rules was incorporated almost without change into *COGSA*. However, Congress made one revision with regard to the language of Section 4(5). Whereas the Hague Rules limit a carrier's liability "per package or unit," *COGSA* more explicitly provides that the $500 limit shall apply "per package . . . or in the case of goods not shipped in packages, per customary freight unit . . . . "[4] This change delineates more clearly than do the Hague Rules that the limitation on the carrier's liability depends on whether the goods are shipped in a "package," as distinguished from "goods not shipped in packages." In the latter case, based upon the number of customary freight units applicable to the nonpackaged goods, liability could well exceed the statutory limit of $500 per package. It was not the purpose of the act, therefore, to relieve the carrier of its normal responsibility for damage to cargo or to unduly limit its liability for just claims when goods have not been shipped in packages. Stirni-

---

**2.** Act of April 16, 1936, ch. 229, 49 Stat. 1207.

**3.** *Hearings, supra* at 47 it is stated that: "Another beneficial and noteworthy provision of the Hague Rules is the stipulation which makes the carrier liable for loss or damage up to £ 100 per package, or unit, unless a greater value shall have been declared by the shipper and inserted in the bill of lading. This is important when we recall that present limits are usually $100 or $250; in fact, one instance is recorded of a limit of 10 francs."

**4** 6A Knauth's Benedict on Admiralty 869, 873 (rev. 7th ed. 1969) (containing the text of the Hague Rules). *See also* The Bill, 55 F.Supp. 780, 782 (D.Md.1944) where it is noted that the phraseology of the several successive bills read "$100 per package or unit; $500 per package or unit; $500 per package or, in case of goods not shipped in packages, per customary freight unit."

mann v. The San Diego, 148 F.2d 141, 143 (2d Cir. 1945).

■ Although the difference in limitation of liability clearly turns on whether the goods are in a "package," Congress did not define this term, and left no interpretative clues in either the statute itself or in any of the legislative hearings.[5] But surely Congress was aware of technological advances since the Hague Rules were adopted such as pallets and forklifts, which by the time of the statute's enactment were being utilized by the industry. Yet, despite such progress in the mode of transporting cargo, Congress chose to retain the commonly used term "package" in the statute, adding the alternative phrase "goods not shipped in packages." These industry advancements do not justify any overextension of the statutory term "package." *See* Leather's Best Inc. v. S. S. Mormaclynx, 451 F.2d 800, 814–815 (2d Cir. 1971) where a large metal container holding numerous small cartons of leather goods was held not be be a "package."

■ "[L]egislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him." Addison v. Holly Hill Fruit Products, Inc., 322 U.S. 607, 618, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944). Since no specialized or technical meaning was ascribed to the word "package," we must assume that Congress had none in mind and intended that this word be given its plain, ordinary meaning. Malat v. Riddell, 383 U. S. 569, 571, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966); Bruhn's Freezer Meats v. United States Department of Agricul-

ture, 438 F.2d 1332, 1338 (8th Cir. 1971). *See generally* 2A Sutherland on Statutory Construction § 47.31 at 155–56 (4th ed. 1973).

The dictionary definitions of "package," though alone insufficient, provide at least a starting point in this inquiry. Webster's Third New International Dictionary 1617 (1966) defines a package as follows: "a small or moderate sized pack: bundle, parcel . . . a commodity in its container . . . a covering wrapper or container . . . a protective unit for storing or shipping a commodity." The word "package" is defined in Black's Law Dictionary 1262 (rev. 4th ed. 1968) as: "a bundle put up for transportation or commercial handling; a thing in form to become, as such, an article of merchandise or delivery from hand to hand . . . . As ordinarily understood in the commercial world, it means a shipping package."

In one of the first British decisions to consider the question of what is a "package," the court interpreted that term in the context of the Carrier's Act, a statute which similarly to *COGSA* limited the carrier's liability for articles "contained in any parcel or package," unless a greater value was declared for the goods. Whaite v. Lancashire & Yorkshire Railway Co. [1874] L.R. 9 Ex. 67. The case involved a group of oil paintings placed into a four-wheeled wagon which had sides but no top, such that the identity of the paintings themselves was hidden, though it was clear that paintings were being transported. Bramwell, B., stated his opinion as follows:

"I think this waggon with its contents was a 'package' within the meaning of the Act. Although one would not commonly describe it in that way, yet,

5. The only reference in the *COGSA* hearings to a judicial decision concerning the "package" limitation occurred when it was noted that in a Supreme Court decision it was "assumed . . . that a liability limited to $100 on a car worth $3,900 was not improper." *Hearings, supra* at 39. In that case, Reid v. Fargo, 241 U.S. 544, 36 S.Ct. 712,

60 L.Ed. 1156 (1916), the Court impliedly held that a fully boxed automobile was in a "package" for purposes of a limitation on the carrier's liability, and that the express company which had so shipped the automobile, without informing its owner, was liable for the difference in the loss of the cargo.

looking at the object and purpose of the Act, I think we are not only entitled, but compelled to say that it was a 'package or parcel' within the section. It is to be observed that the plaintiff himself and his foreman authorize us in so describing it, for they say they 'packed' the goods in the waggon, and no one would doubt that this expression was rightly used; but if so, then the waggon so packed with goods was a package. Further, the packed waggon had this quality of a package about it, that the pictures were so packed by the plaintiff that, though the defendants could see that there were pictures in the waggon, they could not see what was the exact character of the pictures, which the plaintiff's mode of packing concealed. The rule must, therefore, be made absolute to reduce the verdict to 20£."

Cleasby, B., also observed: "It would be absurd to say that the waggon was too large to be a package, plainly, size cannot be a criterion."

Finally, Pollack, B., stated: "The Act uses the words 'parcel' and 'package'. Both words being used, this gives us some assistance in arriving at the meaning of what each signifies. I think that this was a package, if not a parcel."

A later decision, Studebaker Distributors Ltd. v. Charlton Steam Shipping Co., [1938] 1 K.B. 459, 467, cites the language of *Whaite* approvingly, but reaches a contrary result on differing facts. The court there held that a shipment of sixty unboxed automobiles could not justifiably be considered sixty separate packages, saying:

"It seems to me that the primary object of this clause is to protect a shipowner against receiving an article of considerable value so covered as to prevent him from seeing what it is . . . . I do not feel that I can hold that a motor car put on a ship without a box, crate or any form of covering is a package, without doing violence to the English language."

*See also* Stirnimann v. The San Diego, *supra* 148 F.2d at 143.

■ More recent decisions, however, because of the varied items of cargo considered, reveal far less consistency in the criteria used to determine what constitutes a "package." *See* Aluminios Pozuelo Ltd. v. S.S. Navigator, 407 F.2d 152, 154 (2d Cir. 1968). They indicate that regardless of size, shape or weight, cargo fully boxed or crated is a "package" under the act where the mode of packaging conceals the identity of the goods being shipped.[6] On the other hand, freestanding cargo not enclosed in a box or crate has been held to constitute goods not shipped in a "package."[7]

---

6. *E. g.*, Leather's Best, Inc. v. S. S. Mormaclynx, 451 F.2d 800 (2nd Cir. 1971) (99 cartons of leather goods each held a "package") ; Mitsubishi Int'l Corp. v. S. S. Palmetto State, 311 F.2d 382 (2nd Cir. 1962) (fully boxed rolls of steel, each weighing 32½ tons held to be "packages") ; Deere & Co. v. Mississippi Shipping Co., 170 F.Supp. 479 (E.D.La.1959) (a fully boxed tractor held to be a "package"). *See* Herd & Co. v. Krawill Machinery Corp., 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959) (implicit recognition that a fully crated, 19-ton press is a "package") ; Reid v. Fargo, 241 U.S. 544, 36 S.Ct. 712, 60 L.Ed. 1156 (1916) *supra* note 5.

The Second Circuit has also held that, where the shipping documents did not give the carrier any notice of the number of cartons being shipped and both parties treated the shipment as 9 packages, 9 wooden pallets with 6 cardboard boxes on top of each one, bundled together by four metal straps, with a wooden deck on top, constituted 9 packages. Standard Electrica, S.A. v. Hamburg Sudamerikanische, etc., 375 F.2d 943 (2d Cir. 1967). The Second Circuit later found the lack of notice and the agreement between the parties to be important distinctions when it held that 99 cartons of leather shipped in a single metal container constituted 99 packages. *Leather's Best, supra,* 451 F.2d at 815.

7. *E. g.*, General Motors Corp. v. Moore-McCormack Lines, Inc., 327 F.Supp. 666 (S.D.N.Y.), aff'd per curiam, 451 F.2d 24 (2d Cir. 1971) (electric generator shipped without box or crate held not be a "package") ; Gulf Italia Co. v. American Export Lines, Inc., 263 F.2d 135 (2d Cir. 1959) (freestanding tractor with some parts covered by weath-

The more troublesome decisions involve situations where some "preparation for transportation has been made which facilitates handling, but which does not necessarily conceal or completely enclose the goods." *Aluminios, supra* at 155.

In Pannell v. United States Lines Co., 263 F.2d 497 (2d Cir. 1959) modifying 157 F.Supp. 422 (S.D.N.Y.1957), a yacht, placed upon and lashed to a wooden cradle was listed in the contractual bill of lading as a "package." Since the yacht was shipped on the deck of appellant's vessel, *COGSA* was by its own terms inapplicable (see 46 U.S.C. § 1301(c)). The court held that the specific listing in the bill of lading should prevail over the general term "package" in the statute. But, the court carefully noted in *dictum* that if *COGSA* had been applicable, the yacht could hardly have been deemed a "package" so as to limit the carrier's normal liability. 263 F.2d at 498; *see* Petition of United States, 105 F.Supp. 353 (S.D.N.Y.1952), modified and remanded sub nom., Petition of Isbrandtsen, 201 F.2d 281 (2d Cir. 1953) (locomotives stowed on rail and timber beds and secured by wire lashings, clips and turnbuckles held not to be a "package").[8]

Yet, in a later decision, relying on Middle East Agency v. The John B. Waterman, 86 F.Supp. 487 (S.D.N.Y.1949), the court reached an apparently contrary result when a 3-ton toggle press, fastened to a wooden skid in order to facilitate handling and transportation, was held to constitute a "package" and thereby limited recovery for damages to $500. *Aluminios, supra* 407 F.2d at 155.

Both parties urge that the test in *Aluminios* of facilitating the handling or transportation of cargo be adopted in this case. But Hartford contends that the facts here are distinguishable from those in *Aluminios* since the skid was not intended to facilitate the handling of the transformer, which was already movable by means of its lifting lugs, the sole purpose of the skid being to protect the transformer. PFEL maintains, however, that the purpose for which the skid was attached to the transformer should not be a controlling factor, and the skidded transformer should be deemed a "package" regardless of the skid's intended purpose.

■ Any distinction based upon the subjective purpose for which the skid was attached should not be the test for resolving the issue. The skid certainly protected the transformer to some extent, though obviously unsuccessfully, by preventing it from shifting and sliding, and from contact with other cargo during transit. And, the skid could have been utilized to facilitate the transportation of the transformer. Nevertheless, we are unpersuaded that by simply attaching the transformer to a wooden skid, the shipper created a "package." If Black had shipped the transformer sans skid, in no way could it be considered a "package" within the meaning of *COGSA*. General Motors Corp. v. Moore-McCormack Lines, Inc., 451 F.2d 24 (2d Cir. 1971). To hold that somehow a "package" evolved from the mere attachment of the machine to a wooden skid seems a highly unreasonable result. We hold that the electrical transformer bolted to a wooden skid was "not shipped in [a] package."

Reversed and remanded.

---

erproofing paper, but with tractor treads showing, held not to constitute a "package"); The Bill, 55 F.Supp. 780 (D.Md. 1944), aff'd, 145 F.2d 470 (4th Cir. 1945) (oil shipped in bulk in two deep tanks held not to be a "package"); Caterpillar Americas Co. v. S.S. Sea Roads, 231 F.Supp. 647 (S.D.Fla.1964) (uncrated and unboxed tractor held not to have been shipped in a "package").

8. In a fact situation strikingly similar to *Pannell, supra*, the facilitation of handling test was used to hold that a 42-foot yacht lashed to a wooden shipping cradle was a package. Island Yachts, Inc. v. Pacific Lakes Line, 345 F.Supp. 889 (E.D.Ill.1971). The facilitation of handling test has also been used to hold that 142 three-to-nine-ton steel coils, rolled, strapped and tied with steel bands, some wrapped in burlap, constituted 142 packages. Nichimen Co. v. M. V. Farland, 462 F.2d 319, 334 (2d Cir. 1972).