**GENERAL ELECTRIC COMPANY, Plaintiff,**

v.

**M.V. "NEDLLOYD ROUEN", her engines, boilers, etc.,**

**NEDLLOYD LIJNEN B.V. (Nedlloyd Lines), Defendants.**

**No. 84 Civ. 1113 (KTD).**

United States District Court, S.D. New York.

Feb. 28, 1985.

Bigham, Englar, Jones & Houston, New York City, for plaintiff; John E. Cone, Jr., Helen M. Benzie, Lawrence B. Brennan, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for defendants; William Xanttopoulos, New York City, of counsel.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge:

Plaintiff General Electric Company ("G.E.") commenced this action pursuant to the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1300, et seq., to recover for damage to part of its cargo intended for a power station being constructed by G.E. in Saudia Arabia. Defendant Nedlloyd Lijnen B.V. ("Nedlloyd Lines" or "Nedlloyd") moves pursuant to Fed.R. Civ.P. 56 for partial summary judgment limiting its liability to $500.00 per package or customary freight unit. *See* 46 U.S.C. § 1304(5).

## FACTS

On February 16, 1983, Nedlloyd issued a bill of lading to G.E. for the carriage of twenty-six items of cargo, including a generator Auxiliary Compartment (Case 101) and a Control Cab (Piece 214), from Portsmouth, Virginia to Yenbu, Saudi Arabia. Case 101 and Piece 214 were allegedly damaged en route to Saudi Arabia when, on the evening of February 19, 1984, the M.V. Nedlloyd Rouen encountered heavy weather, and both items slid from the flatbed on which they were stowed in deck 2 of the vessel. *See* Affidavit of William Xanttopoulos, Exh. M (deck log); Exh. H (stowage plan).

G.E. apparently had the two units repaired at a cost of approximately $59,933.28 and then sold the units to an affiliated company for $16,000.00. *See id.*, Exh. I (Deposition of Richard J. Condon). Thereafter, G.E. replaced the two units at a cost of $686,325.00. *See id.*, Exh. J (letter from Condon concerning insured value of machinery); Affidavit of John E. Cone, Jr.,

Exh. 8. In its action, G.E. seeks to recover the cost of replacing the units, the temporary repair costs less salvage, and other expenses such as survey costs.

## DISCUSSION

COGSA applies by its own force to all bills of lading covering shipments of goods from the United States in foreign trade. 46 U.S.C. § 1300; *S.M. Wolff Co. v. The Exiria*, 200 F.Supp. 809, 811 (S.D.N.Y. 1961). Plaintiff's cargo was transported from Portsmouth, Virginia under a bill of lading that contained a "U.S.A. Clause" incorporating COGSA in the contract of carriage. *See* Xanttopoulos Affidavit, Exh. A (bill of lading). Thus, COGSA clearly applies to the instant contract.

COGSA § 4(5) provides:

Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier.

46 U.S.C. § 1304(5).

## I.

Nedlloyd's bill of lading form contains a box (clause 6) on the front of the form labeled "Excess Valuation" and refers the reader to clause 7(1)b on the reverse side of the form. This box was left blank on the bills of lading covering this shipment. Thus, pursuant to section 4(5) of COGSA, absent G.E.'s declaration of the value of its cargo, Nedlloyd's liability is limited to either $500 per package or per customary freight unit. Had G.E. chosen to declare the value of its cargo, according to rule 12 of Nedlloyd's Tarriff filed with the Federal

Maritime Commission ("FMC"), it would have had to pay an additional ten percent of the total declared valuation over freight.

G.E. does not dispute the fact that it did not declare the value of the two units. Instead, G.E. advances three primary arguments which challenge Nedlloyd's bill of lading form and the ten percent surcharge policy as unconscionable. First, plaintiff argues that Nedlloyd should not be afforded the benefit of any limitation of liability since the bill of lading merely incorporated COGSA's limitation provision without explicitly setting forth the provision and that the other clauses on the back of the form created ambiguities that should be resolved against Nedlloyd. Second, plaintiff submits exhibits to show that the size of the print used on the back of the bill of lading form was inadequate and that the notice to plaintiff of the option of declaring the value of its cargo was insufficient. I conclude that these first two arguments are meritless.

■ The burden is on the shipper to show that the "opportunity for choice of evaluations and rates did not in fact exist." *See Wuerttembergische & Badische Versicherungs-Aktiengesellschaft v. M/V Stuttgart Express*, 711 F.2d 621, 622 (5th Cir. 1983) (*citing Petition of Isbrandtsen Co.*, 201 F.2d 281, 285 (2d Cir.1953)). The Nedlloyd form clearly contained a space entitled "excess valuation" within which G.E. could have inserted a declaration of value. The combination of the form's inclusion of such a space, the incorporation of COGSA into the contract of carriage, and the filing of the tariff with the FMC, supports the conclusion that G.E. had adequate notice of the $500 limitation. *See Wuerttembergische*, 711 F.2d at 622 (published tariff gave shipper notice of valuations satisfying requirement that the shipper be given an opportunity to avoid the limitation).

■ Furthermore, G.E.'s assertion that the print on the form was too small to provide adequate notice and that, in fact, none of its employees knew that an option to declare the value of the units existed, does not exonerate G.E. from the operation of COGSA's limitation provision. The fact that G.E.'s agents did not read the back of the form or know what COGSA provided is irrelevant to the conclusion that G.E. was put on notice of its right to declare the value of its cargo.

■ G.E.'s third argument is that, as a practical matter, it was not given any choice to declare value because the cost of doing so is so exorbitant that no shipper ever would or has declared value. G.E. maintains that it would have opted to declare the cargo's true value if the charge by Nedlloyd had been reasonable. Both the policy argument and the factual assertions advanced by G.E. are specious.

The policy argument has been addressed by Lord Diplock of the House of Lords who notes that "it is sometimes asserted, with moral indignation, that carriers have robbed shippers of their option by insisting upon excessive freight rates if their liability is to exceed the ordinary limitation figure." Diplock, "Conventions and Moral Limitation Clauses in International Maritime Conventions," 1 *Journal of Maritime Law and Commerce*, 529–530 (1970). Diplock points out that, if indeed it was more economical for the carrier to insure against the excess liability than for the cargo owner to cover it with his own cargo insurer, the carrier would quote rates which would reflect the lower cost. "There is no reason why he should allow the higher premium to go into the pocket of the cargo insurer." *Id.* Furthermore, it appears from G.E.'s submissions that there was competition for this shipping route. If Nedlloyd's rates were excessive, G.E. could have attempted to negotiate a lower rate or hire one of Nedlloyd's competitors.

Regarding G.E.'s factual assertion, I note that there is no indication that G.E. had any desire whatsoever to declare a higher value and obtain added insurance from the carrier. Indeed, the evidence is to the contrary. An employee for G.E., Anthony A. Vinci, testified that, in his forty-three years in the transportation department of the company, G.E. never once de-

clared the value of its cargo to avoid the COGSA limitation. *See* Xanttopoulos Affidavit, Exh. D at 127–128. G.E. has presented no evidence to indicate that in this case it intended to abandon a policy it had pursued for at least the past forty-three years. Finally, because the *ad valorem* clause is filed with the FMC, G.E. should address to that body its argument that the additional charge is unconscionable. For all of the above reasons, I conclude that Nedlloyd's bill of lading form is adequate, and its excess valuation charge policy is not unconscionable.

Thus, because plaintiff has not raised any material issue of fact, partial summary judgment is granted in favor of defendant. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The movant, Nedlloyd, has sustained its burden of establishing that there is no material fact in dispute, and that it is entitled to judgment as a matter of law. *Id.* Accordingly, since plaintiff failed to declare the actual value of its cargo, defendant's liability is limited to either $500 per package or $500 per customary freight unit.

## II.

The parties appear to agree, or at least G.E. does not dispute, that the amount of limitation, if any, for Piece 214 would be $500 per customary freight unit or per 40 cubic feet totalling $28,000.00.[1]

There is no such agreement, however, with respect to Case 101. I conclude, for the following reasons, that Case 101 constitutes a package within the meaning of Section 4(5) of COGSA. Therefore, defendant's liability, if any, for the damage to this item would be limited to $500.

COGSA does not define "packages;" thus, courts have employed a "straight-forward contract analysis" in determining whether a particular piece of cargo is a "package." *See Allied International American Eagle Trading Corp. v. The S.S. Yang Ming*, 672 F.2d 1055, 1057 (2d Cir.1982). Case 101 is described on the bill of lading as "CS Control Cab Contains 12 Batteries" and under the column entitled "no. of pkgs" it is listed as 1 package. The packing list and commercial invoice refer to the control cab as "1 case." *See id.*, Exhs. E and F.

Furthermore, the appearance of the unit and the manner in which it was prepared for shipment lends support to a finding that the parties intended Case 101 to be a package within the meaning of COGSA. *See Solar Turbines, Inc. v. M/V Alva Maersk*, 584 F.Supp. 32, 33–34 (S.D.N.Y. 1983) (air exchange unit which was partially covered found to be a package based on intention of contracting parties and the physical description of the unit).

Although courts have held that completely uncovered or uncrated items are not

---

**1.** Freight on this cargo was paid by G.E. to Nedlloyd on the basis of "measurement tons." Defendants' Exh. B (Deposition of Anthony J. Vinci) at 64. The "measurement ton" basis of freight permits the carrier to charge freight based upon the number of tons or upon the number of 40 cubic foot units, whichever is greater. In this case, the cargo was more volume, than weight, intensive; hence, the freight is based on measurement. Piece 214 measured 56 units. Courts have held that customary freight unit refers to the unit of the cargo "customarily used as the basis for the calculation of the freight rate to be charged." *General Motors Corp. v. Moore-McCormack Lines, Inc.*, 451 F.2d 24, 25 (2d Cir.1971) (citing *The Bill*, 55 F.Supp. 780, 783 (D.Md.1944)).

In computing the customary freight unit in a particular case, a court must look to the unit which the carrier actually used to compute the

freight charge for the shipment. *Croft & Scully Co. v. M/V Skulptor Vuchetich*, 664 F.2d 1277, 1282 (5th Cir.1982) (quoting *Caterpillar Americas Co. v. S.S. Sea Roads*, 231 F.Supp. 647, 649 (S.D.Fla.1964), *aff'd*, 364 F.2d 829 (5th Cir. 1966)). For example, in a case in which the freight charged was calculated for each locomotive, the court held that a locomotive was the customary freight unit. *See India Supply Mission v. S.S. Overseas Joyce*, 246 F.Supp. 536 (S.D.N.Y.1965). Where the freight charged was for the shipment of power plants, an entire power plant was ruled to be the customary freight unit. *See General Motors Corp.*, 451 F.2d at 26. In the present case, the carrier calculated the freight charge based on 40 cubic foot units. Piece 214 consisted of 56 40-cubic-foot freight units. Hence, Nedlloyd's liability for this piece totals $28,000.00 (56 units × $500).

necessarily packages, *see, e.g., Petition of Isbrandtsen Co.,* 201 F.2d 281, 286 (2d Cir.1953), items which are only partially covered have been the subject of many disputes, *see, e.g., Aluminios Pozuelo Ltd. v. S.S. Navigator,* 407 F.2d 152, 155 (2d Cir.1968). Case 101, the control cab, was enclosed in steel on a weatherproof steel base. The base was part of the unit. Xanttopoulos Affidavit, Exh. G (Deposition of Charles M. Vandergrift). In preparation for shipping, plywood was bolted over the air conditioning holes in the cab and caulking was placed around it. *Id.* The unit was blocked with timber from the inside. *Id.* Unlike the generator in *Solar Turbines, Inc. v. S.S. Al Shidadiah,* in which I found the enclosure was "not preparation for shipping, but rather primarily, if not solely, part of the product itself," *see* 575 F.Supp. 939, 941 (S.D.N.Y.1983), here, "some packaging preparation for transportation has been made which facilitates handling, but which does not necessarily conceal or completely enclose the goods." *Alumninios,* 407 F.2d at 155. Thus, the fact that G.E.'s control cab was braced and blocked with approximately 300 pounds of material that served no purpose other than to fortify the unit for shipping lends substantial support to the conclusion that Case 101 was a package. Finally, batteries and equipment were stored in Case 101 during transport. This lends additional support to the conclusion that Case 101 was a package, and not merely a self-contained unit. *See* Xanttopoulos Affidavit, Exh. G. at 10.

Accordingly, defendants' motion for partial summary judgment is granted and its liability, if any, shall be limited to $28,000 for Piece 214 and $500 for Case 101.

SO ORDERED.